**KAMINE/BESICORP ALLEGANY L.P., Plaintiff,**

v.

**ROCHESTER GAS & ELECTRIC CORP., Defendant.**

No. 95–CV–6045L.

United States District Court, W.D. New York.

Nov. 2, 1995.

See also 908 F.Supp. 1180.

Douglas A. Foss, Harris, Beach & Wilcox, Rochester, NY, Anthony R. Palermo, Hodgson, Russ, Andrews, Woods & Goodyear, Rochester, NY, William A. Escobar, Alan R. Kusinitz, Kelley Drye and Warren, New York City, for plaintiff.

John Stuart Smith, David M. Schraver, Flor M. Colon, Nixon, Hargrave, Devans & Doyle L.L.P., Rochester, NY, for defendant.

## DECISION AND ORDER

LARIMER, District Judge.

### BACKGROUND

This is an antitrust action brought by plaintiff, Kamine/Besicorp Allegany L.P. ("Kamine"), against defendant Rochester Gas & Electric Corporation ("RG & E"). Kamine, which seeks both damages and injunctive relief, asserts causes of action under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

The facts of this case have been set out at some length in a prior decision of this court,[1] and will be repeated here only as necessary. In short, the case arises from RG & E's unwillingness to purchase power from Kamine at the price set in a Power Purchase Agreement ("PPA") that Kamine and RG & E entered into in 1990 with the approval of the New York State Public Service Commission ("PSC"). Kamine alleges that RG & E is trying to drive Kamine out of business so that RG & E can maintain its monopoly as a producer and seller of electricity within RG & E's service area.

The current price that RG & E must pay for power under the PPA is $.06 per kilowatt hour ("kwh"). RG & E claims that the contract price is far above RG & E's "avoided cost," which is what it would cost RG & E to buy or produce the same power at current market rates or under the current tariff (known as the "SC5") filed by RG & E and approved by the PSC. RG & E contends

---

1. *See* 908 F.Supp. 1180, Decision and Order, March 20, 1995.

that its avoided cost is now about $.02 per kwh. RG & E asserts that the PPA price is so much higher than its avoided cost that the contract should be rescinded or reformed. RG & E is currently prosecuting an action against Kamine in New York State Supreme Court seeking such relief.

Shortly after this case was commenced, Kamine moved for a temporary restraining order ("TRO") and preliminary injunction ordering RG & E to comply with the terms of the PPA. On March 20, 1995, I granted the motion for a TRO, and directed RG & E to accept electric power from Kamine under the terms of the PPA, and, in accordance with the PPA, to pay Kamine no less than six cents per kilowatt hour for that power.

As stated in the March 20 decision, the purpose of the TRO was to preserve the situation "long enough for the court to decide the motion for a preliminary injunction." Decision and Order, March 20, 1995, at 15. The parties then engaged in discovery relating to the preliminary injunction motion.

Both sides have submitted substantial additional written materials in support of their respective positions, and the court heard extensive oral argument on the injunction motion. At oral argument, counsel for both sides agreed that no factual hearing was necessary, and that the written and documentary materials that had been submitted were adequate for the court to render a decision. By stipulation of the parties, the TRO has been extended throughout this period, pending issuance of the court's decision on the preliminary injunction motion.

## DISCUSSION

### I. Standards For Granting A Preliminary Injunction

In the Second Circuit a court may issue a preliminary injunction upon a showing of irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation with a balance of the hardships tipping decidedly toward the party requesting the injunction. *Acquaire v. Canada Dry Bottling Co. of New York,* 24 F.3d 401, 409 (2d Cir.1994); *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989). The applicant for an injunction must show "injury for which a monetary award cannot be adequate compensation ... [because] where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

With respect to irreparable harm, "doubts as to whether an injunction sought is necessary to safeguard the public interest ... should be resolved in favor of granting the injunction." *Gulf & Western Indus., Inc. v. Great A. & P. Tea Co., Inc.,* 476 F.2d 687, 699 (1973). It is clear, however, that "possible irreparable injury" is a requirement of all preliminary injunctions. *S.E.C. v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir.1990); *Gulf & Western,* 476 F.2d at 692.

Whether a particular harm is irreparable turns on its imminence and the lack of an adequate remedy at law. "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (citations omitted). "An applicant for a preliminary injunction 'must show that it is *likely* to suffer irreparable harm if equitable relief is denied.' Thus, a mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991) (quoting *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990)). Finally, "[i]n making the determination of irreparable harm, both harm to the parties and to the public may be considered." *Long Island R.R. Co. v. International Assoc. of Machinists,* 874 F.2d 901, 910 (2d Cir. 1989), *cert. denied,* 493 U.S. 1042, 110 S.Ct. 836, 107 L.Ed.2d 831 (1990).

As to the likelihood of success on the merits in antitrust cases, it is up to the court to decide whether the evidence demonstrates that plaintiff's allegations are of suffi-

cient substance to warrant an examination of the other requirements for granting an injunction. *Gulf & Western,* 476 F.2d at 693. The ultimate inquiry is "whether the probable future effect of the transaction will be substantially to lessen competition." *Id.* at 694 (citations omitted).

## II. *Irreparable Harm*

■■■ Kamine contends that if an injunction does not issue, Kamine will be forced to default on certain financial obligations to its lender, General Electric Capital Corporation ("GECC"), and GECC may foreclose on its loans to Kamine, driving Kamine into bankruptcy. In support of this allegation, Kamine alleges that RG & E's prior refusal to purchase power at the PPA price prevented Kamine from repaying a $90 million construction loan on time, which in turn has made it impossible for Kamine to obtain permanent financing. As a result of these difficulties, GECC has exercised some of its rights under its contract with Kamine, including the imposition of a default interest rate on Kamine's loans. In addition, GECC has elected to exercise its right to apply RG & E's payments to Kamine's obligation to GECC. In other words, the payments from RG & E are now going directly to GECC, not to Kamine. GECC can then advance funds to Kamine upon Kamine's request, if GECC chooses to. Without an injunction, Kamine contends, that source of revenue would dry up, and GECC might foreclose on the loan.

GECC, however, has not demonstrated any particular desire to pursue its remedies under the agreement to the fullest extent. On September 13, 1994, for example, GECC sent to Kamine what GECC described as a "draft of GECC's forbearance letter for your [*i.e.* Kamine's] review & comments." Defendant's Exhibit Book in Opposition to Motion for Preliminary Injunction ("Def.Ex.") Ex. L. This letter stated that GECC had reviewed a default notice sent by Kamine to its planned "thermal host," the greenhouse which was supposed to buy the steam produced by Kamine's plant. Kamine had sent a default notice to the greenhouse operator because the greenhouse was not prepared to purchase the steam as planned. The problems

between Kamine and the greenhouse operator were never resolved, and the deal was never consummated.

The presence of a thermal host was a precondition to Kamine's obtaining status as a qualifying facility ("QF") under the Federal Power Act, 16 U.S.C. §§ 796(18)(B). QF status in turn was a condition that Kamine was obligated to achieve and maintain under its agreement with GECC. That is what prompted GECC to send the forbearance letter to Kamine.

In the draft letter, GECC stated that it "agree[d] to forebear [sic] from exercising any remedies" available to it under its agreement with Kamine for thirty days. The letter stated that GECC reserved all of its rights to exercise such remedies at the end of that period. However, it does not appear that GECC did pursue any further remedies regarding this matter.

In another letter, dated January 31, 1995, GECC "reiterate[d] its previously stated concern with respect to [Kamine's] ability to satisfy the conditions precedent to funding of further construction loan draws and the conditions precedent to permanent financing as set forth in the operative documents." It also noted that "RG & E has now purported to terminaate [sic] the Power Purchase Agreement," which "would constitute a Special Event of an Event of Default." Def.Ex. N. Although again reserving all its rights and remedies in the event of a default, however, GECC stated that it had elected to fund Kamine's requested construction loan draw. *Id.*

A similar letter is dated February 27, 1995. Again, GECC recited that it reserved all its rights in the event of a default, but stated that it had elected to fund the February construction loan draw. Def.Ex. O.

On April 13, 1995, GECC sent a letter to Kamine stating that Kamine was in default on its construction mortgage bond payment that had come due on March 31, 1995. GECC stated that it was "terminat[ing] its obligation (but not its right)" to make further project loans, and that it was exercising its right to have RG & E's future payments

applied directly to Kamine's obligations to GECC. Def.Ex. P.

Notably, however, GECC added that it was not at that time electing to exercise certain more drastic rights, "includ[ing] the acceleration of any obligation not already due, the remedy to take possession of or title to all or any material part of the assets of [Kamine], or seek to cause repayment by [Kamine] of moneys not otherwise already due (other than through capture of moneys otherwise available to [Kamine]." *Id.*

Although GECC has exercised some of its rights under the agreement with Kamine, then, it has also displayed a certain hesitation about pursuing its rights to the fullest at the earliest opportunity. The relatively modest steps taken by GECC do not support Kamine's previous assertions at the time of the TRO application, which depicted GECC as eagerly waiting to lower the boom on Kamine at a moment's notice.

At the time that the TRO decision was entered, the purportedly threatened foreclosure was, according to Kamine, only about two weeks away from becoming a reality. That allegedly imminent foreclosure, and Kamine's ensuing bankruptcy, were the basis for my finding that Kamine had demonstrated a serious enough threat of imminent irreparable harm to justify granting the TRO in order to preserve the status quo long enough to decide the motion for a preliminary injunction. Now that additional facts about GECC's actions and intentions have been obtained in discovery and submitted to the court, however, it appears that the threat of foreclosure is less imminent than Kamine alleged previously.

It is understandable why GECC would *not* want to foreclose while litigation is still pending between Kamine and RG & E, both here and in state court. According to Kamine, foreclosure would drive Kamine out of business, leaving GECC in possession of the power plant. There seems to be little incentive at this stage for GECC to want that to happen, however. For one thing, Kamine is a party to the PPA, the continued effectiveness of which represents its (and therefore GECC's) best hope of obtaining at least $.06 per ("kwh") for the energy produced by the plant.

Without Kamine, then, GECC would be left in the position of taking over the plant faced with the prospect of either running it itself, or attempting to find a new buyer for the plant. The former option would be less attractive than simply allowing Kamine to continue running the plant in the hopes that Kamine would ultimately prevail on its bid to enforce the PPA, especially since RG & E's payments are already going directly to Kamine. By foreclosing and taking over the plant, GECC might accomplish little other than disrupting the plant's operations.

Assuming control of the plant might also make things considerably worse for GECC at this point. In its motion for leave to intervene in a pending FERC proceeding concerning the retroactive waiver of Kamine's QF requirement, GECC states that upon a default by Kamine, GECC has the right to step into Kamine's shoes under the PPA. *See* Def.Ex. BB at 12. If the reason for Kamine's default were RG & E's refusal to pay the prices set in the PPA, however, GECC might well also find itself stepping into Kamine's shoes in the current litigation with RG & E. Presumably, GECC would prefer to have the brunt (and the cost) of the legal battles with RG & E borne by Kamine. Indeed, GECC's statement in the motion to intervene that GECC had not decided what course it would take if RG & E's interpretation of the PPA *prevails* suggests that GECC, for the time being at least, is content to let the litigation between Kamine and RG & E play itself out completely before GECC takes any decisive steps.

Furthermore, even if Kamine fails in its attempts to enforce the PPA, Kamine would still be able to get the same price for its power that GECC would get if GECC were running the plant itself. Regardless of who runs the plant, then, the price of power is going to be the same. By foreclosing and taking possession of the plant, then, GECC would gain little, and in fact might be worse off.

Trying to sell the plant would be an equally unappealing proposition. The PPA provides that "[o]ther than for collateral security

purposes, if the Plant is to be sold to any entity, this Agreement shall be assigned to and assumed by the purchaser ..." PPA at 49. As with GECC, however, a potential buyer who wanted to be assigned Kamine's rights to the PPA price for power produced by the plant would have to consider the possibility of engaging in litigation with RG & E—litigation which had contributed to driving the previous operator of the plant out of business. Naturally this would hardly enhance the market value of the plant.

Of course, if a prospective buyer were willing to sell power at RG & E's avoided cost in order to avoid the costs of litigation, that would also lessen the plant's market value compared to what it was when Kamine entered into its agreement with GECC. Instead of expecting a long-term contract with rates of at least $.06 per kwh, the buyer might have to settle for shorter-term contracts at a much lower price. Even a newly-negotiated PPA would probably have a lower contract price than Kamine's PPA, since the rates that were used in negotiating the latter were later found by the PSC to have been unrealistically high, and are no longer in effect.

It should also be noted that RG & E has stated its willingness to purchase power from Kamine at RG & E's current avoided cost as set by the SC5. Kamine maintains that this would not suffice for Kamine to meet its obligations to GECC, because the financing arrangements were all based on the assumption that Kamine would receive the PPA price. In light of the facts before me, however, I am not convinced that Kamine has demonstrated that foreclosure would be likely to result, at least in the short term, if it sold power at the SC5 rate. Again, GECC itself could not hope to receive a higher price without engaging in a legal battle with RG & E, the outcome of which would be uncertain.

Furthermore, until the TRO was entered, Kamine simply refused to sell power to RG & E at anything less than the PPA price, so for some time it was not receiving any payments from RG & E at all. As noted, though, GECC showed some restraint in pursuing its remedies against Kamine. If GECC (which, as stated, is now receiving the payments directly) can get at least a limited cash flow from sales at the SC5 rate, it may be even less likely to take drastic action now, while these court actions are pending. Kamine's all-or-nothing approach up until now has left this middle path untested.

Sales at the avoided-cost price, then, might well dissuade GECC from foreclosing, since some cash would be coming in. Certainly the harm would seem to be less imminent than if Kamine sold no power to RG & E at all. In addition, if GECC did not foreclose, any harm that did result to Kamine would be remediable, should Kamine prevail in its litigation with RG & E. If the PPA is found to be enforceable, the harm would simply be that Kamine had not been paid enough by RG & E. That harm could be remedied by the payment of damages by RG & E.

In my March 20, 1995 decision, citing *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969 (2d Cir.1989), I noted that "[t]he ability of a creditor to foreclose ... can suffice to establish irreparable harm." Decision and Order, Mar. 20, 1995 at 16. However, the above-recited facts, some of which have been revealed in the ensuing discovery, make it less than likely than it previously appeared that the alleged harm to Kamine will in fact occur prior to resolution of the pending lawsuits.

These facts also demonstrate a significant distinction between this case and *Tucker.* In that case, the plaintiffs, who were limited partners in the defendant partnerships, sought to enjoin the partnerships from making payments to the defendant general partner, who the plaintiffs alleged had breached his fiduciary duties. One of the partnerships, which was "effectively insolvent," *id.* at 971, was indebted to a business co-owned by the general partner and another person in the amount of $875,000. The partnership also owed a bank over $2,000,000, due on demand. Based on these particular facts, the Court of Appeals rejected the defendants' argument that the danger of the plaintiffs' bankruptcy (by virtue of their liability for the partnerships' debts) was speculative. The court stated that the combination of the partnership's "precarious financial situation" and the bank's ability to demand immediate

payment of its loan gave the general partner "ample incentive" to demand immediate payment of the amount owed to him, so as to limit his own financial exposure by having his loan paid ahead of the bank's. The court concluded that these facts "ma[de] the likelihood of bankruptcy more than merely speculative." *Id.* at 975.

As stated, the facts that have been developed in the case at bar have not shown a similar likelihood that GECC will foreclose. It has already displayed some reluctance to take any steps which might drive Kamine out of business or disrupt the operation of the plant, and indeed it seems logically to have little incentive to do so. I conclude, therefore, that the danger of foreclosure and Kamine's ensuing demise is too speculative at this point to justify the issuance of a preliminary injunction.

### III. Balance of the Hardships

Besides irreparable harm, the moving party must either show that it is likely to succeed on the merits or that the balance of hardships tips decidedly in its favor. Kamine has not expressly chosen to proceed under one or the other of these routes, and so the court will address both.

For many of the same reasons that I find that Kamine has not shown a threat of imminent irreparable harm, I do not believe that it has demonstrated that the balance of hardships tips decidedly in its favor. Not only is the alleged harm to Kamine speculative, but RG & E has demonstrated that it or its ratepayers will be harmed if Kamine's requested injunction is granted. RG & E has submitted evidence, particularly affidavits of Paul G. Ruganis, RG & E's Group Manager of Strategy Development Services, that if it is forced to continue purchasing power from Kamine at the PPA price, it will cost RG & E significantly more money than if RG & E were able to purchase that same power at its actual avoided cost. Ruganis opines that payment of the PPA price will result in ex-

cess costs to RG & E of about $57,000 per day, or $20,000,000 per year.[2]

In the FERC proceeding concerning Kamine's QF waiver, the PSC has echoed those views. The PSC opposed Kamine's request for a waiver on the ground that the PPA price would force up RG & E's—and ultimately its ratepayers'—costs by four percent. Def.Ex. G at 5. As noted, harm to the public may properly be considered in deciding a motion for a preliminary injunction. *Long Island R.R. Co.*, 874 F.2d at 910.

In response to these contentions, Kamine has for the most part not challenged RG & E's figures as such. Instead, Kamine relies primarily on the argument that there can be no "harm" to RG & E because under the PPA, RG & E *is* paying its avoided cost. Kamine bases this assertion on its argument that under PURPA, avoided costs can be measured either at the time of delivery or at the time the contract was executed. In this case, Kamine states, avoided costs were measured at the time the PPA was entered into, based on the then-existing long-range avoided costs ("LRACs"), which were the PSC's predictions of future avoided costs.

Regardless of how sound a legal principle that may or may not be with respect to PURPA, however, I do not believe it is of much significance in this antitrust action for purposes of determining, as a factual matter, the relative harm to the two sides that may result from the issuance or denial of an injunction, *pendente lite.* The unavoidable fact is that if RG & E is not forced to pay the PPA price, it can purchase the same energy at its *actual* avoided cost, which bears no relation to the LRACs. In fact, the 1988 LRACs upon which Kamine relies later proved to be so inflated that the PSC withdrew them in 1991 on the ground that they had been "overstated." Kamine's argument is purely semantic and ignores the commonsense meaning of avoided costs in the context of this case.

---

**2.** Those figures do not appear unreasonable. Assuming a PPA rate of $.06 per kwh and an avoided-cost rate of $.02 per kwh under the SC–5 tariff, RG & E would pay an excess of $.04 per kwh. The nominal capacity of Kamine's plant is 55 megawatts, or 55,000 kw. Purchasing 55,000 kwh of power at an excess cost of $.04 per kwh would result in a total excess cost of $2200 per hour, which equals $52,800 per day, or $19,272,-000 per year.

Kamine also argues that RG & E is actually paying far more than $.06 per kwh for energy from some of its own plants, so that paying Kamine the PPA price will actually save RG & E money. RG & E disputes this assertion.

It appears that the cause of this dispute is a difference of opinion over whether RG & E's fixed costs (i.e. costs stemming simply from the existence of a facility, irrespective of the costs of actual energy production) should be figured into the calculation of RG & E's energy costs. Kamine contends that they should be, RG & E that they should not.

I find RG & E's arguments in this regard more persuasive. Fixed costs are just that—fixed. As such, they cannot be "avoided." Whether RG & E purchases power from Kamine or not, then, it will still have to bear these fixed costs. It is not logical, therefore, to say that RG & E will somehow save money by buying additional power from Kamine. The proper measure to determine the effect of buying power from Kamine under the PPA is to examine the difference between the PPA price and RG & E's cost of the same amount of power at RG & E's "variable" cost—i.e., the actual cost of the power itself, not counting unavoidable, fixed costs. Kamine has not rebutted RG & E's showing that under that calculation, purchasing power under the PPA will greatly *increase* RG & E's costs for that power.

Kamine also asserts that RG & E is collaterally estopped from raising the whole issue of excess costs by reason of FERC's decision in *New York State Elec. and Gas Corp.*, 71 F.E.R.C. 61,027 (1995) ("*NYSEG*") (Kamine's App. Tab H). In *NYSEG*, FERC rejected an argument by a utility (an argument in which RG & E joined as an intervenor) that the utility should not have to pay the contract price for power from a QF if that price exceeded the utility's actual avoided cost. FERC held that the contract price was controlling even if avoided costs had risen unexpectedly.

I am not persuaded by Kamine's argument that this ruling estops RG & E from raising issues concerning excess costs under the PPA. For the doctrine of collateral estoppel, or issue preclusion, to apply, the issues involved in the current and prior litigation must be "substantially the same." *ITT Corp. v. United States*, 963 F.2d 561, 564 (2d Cir.1992).

The utility's claim in *NYSEG* was based on PURPA; the utility argued in favor of a literal reading of PURPA's provision that the price paid by a utility for energy from a QF should not exceed the utility's actual avoided cost. RG & E, however, is currently litigating in state court whether, as a matter of state *contract* law, the PPA should be reformed or rescinded. RG & E is not arguing that the PPA price is invalid under PURPA.

Thus, the issues in *NYSEG* and in the state court action are not substantially the same. RG & E's present dispute with Kamine is basically about New York contract law, not PURPA. Since the legal issues therefore turn upon fundamentally different bodies of law, RG & E is not estopped from arguing in this court that the excess cost imposed by the PPA may be considered in assessing the harm that would result from the issuance of an injunction. Based on the evidence presented, I find that RG & E would be harmed by an injunction, and that the balance of hardships does not tip decisively in Kamine's favor.

## IV. Likelihood of Success

In the TRO I stated that "there [we]re serious questions going to the merits to make them a fair ground for litigation." Decision and Order, Mar. 20, 1995 at 18. I also noted, however, that the more serious and imminent the potential harm to the movant, the less need there is for the movant to show a likelihood of success on the merits. *Id.* at 14, 17. It is clear from the language of the TRO that the primary reason for granting the TRO was not that Kamine was likely to succeed on the merits, but that, if Kamine's allegations were true, it was "faced with imminent, irreparable injury" which suggested that "[a]t the very least, the situation should be preserved long enough for the court to decide the motion for a preliminary injunction." *Id.* at 15.

I also noted in the TRO decision, however, that "many of the facts have yet to be proved

..." *Id.* at 18. As the preceding discussion explains, the evidence that has been produced during discovery and submitted to the court in connection with the motion for an injunction suggests that the potential harm to Kamine may not be as imminent or catastrophic as it previously alleged. That being so, whether Kamine is likely to succeed on the merits becomes of correspondingly greater concern.

I find that Kamine has not demonstrated a likelihood of success on the merits in this litigation. The fundamental difficulty with Kamine's case is that whatever the merits of its contentions regarding PURPA and state contract law, this action is predicated not on PURPA or contract law, but on the antitrust laws. Kamine has simply not shown that it is likely to succeed on an antitrust theory.

The basic thrust of Kamine's antitrust allegations is that RG & E has a monopoly in its geographic area as a producer and seller of electric power, and that RG & E wants to maintain that monopoly by preventing new producers or sellers from entering the market. Having failed thus far to prevent Kamine from entering the market (insofar as Kamine is now selling power to RG & E), RG & E is allegedly trying to drive Kamine out of business by its actions.

The principal means by which RG & E is doing this, Kamine alleges, is RG & E's use of its monopsony power as a buyer of wholesale electric power within RG & E's geographic area. Kamine contends that this monopsony power allows RG & E to demand a predatory price from Kamine, *i.e.*, a price below that which Kamine needs if it is to survive.

Kamine's allegations, however, fail to indicate a truly anticompetitive effect as a result of RG & E's actions. The chief danger associated with monopsony power—market power on the buying side of the market—occurs when a company has significant market power both "upstream" and "downstream," meaning that the company can control the level of demand for the product that it buys and the level of supply for the product that it sells to its own buyers. Such a market position allows the company to demand a low price from its suppliers while simultaneously raising the prices it charges its buyers.[3]

■■■ The problem with this type of monopsony power, then, is that ultimately it can injure consumers by forcing up the price of the end product. Where the risk of that happening is slight or nonexistent, however, monopsony power *per se* does not create an antitrust concern. IIA Areeda, *supra*, ¶ 574 at 300 (citing *Kartell v. Blue Shield of Massachusetts*, 749 F.2d 922, 930–31 (1st Cir. 1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 2049, 85 L.Ed.2d 322 (1985)).

There is little evidence here that RG & E's alleged use of its monopsony power poses a threat of increased consumer prices. In fact, the evidence suggests the opposite—that paying the price under the *PPA,* which Kamine demands, will drive up the cost to the ratepayer. Furthermore, although RG & E does possess both upstream and downstream power in the energy market, its position is not analogous to that of a manufacturer of goods that can simply reduce its output in order to increase its price. As a state-regulated utility, RG & E cannot unilaterally reduce its output of electric power to the point where consumers are willing to pay an exorbitant price. If anything, if RG & E's own cost of power drops, it would have greater difficulty justifying approval of a rate increase. *See* IIA Areeda, *supra* at 300 (noting that "[i]f selling prices are regulated, they may fall as costs fall").

A further weakness with Kamine's case is that it is based more on alleged violations of PURPA than of the antitrust laws. Although actions that violate PURPA could conceivably violate the antitrust laws as well,

---

**3.** One commentator gives the following illustration:

> For example, suppose bauxite is an indispensable element for making aluminum, that bauxite has no other use, and that the defendant is the sole producer of aluminum. The defendant necessarily has monopsony power in the bauxite market. If he tries to force down the bauxite price by buying less—say, from the competitive level of 1,000 units to 800 units—he cannot make as much aluminum as before, and thus its selling price must rise.

IIA Phillip E. Areeda, et al., Antitrust Law ¶ 574 at 300 n. 2 (1995 ed.)

they are not the same thing, and one does not necessarily flow from the other. Even if Kamine's allegations that RG & E has violated PURPA are true, that does not mean that RG & E has acted in an anticompetitive manner.

PURPA itself makes little mention of antitrust laws, other than the following statement contained in 16 U.S.C. § 2603(1):

Nothing in this Act or in any amendment made by this Act affects—

(1) the applicability of the antitrust laws to any electric utility or gas utility ...

This statement, then, indicates that while PURPA was not intended to *protect* utilities from the reach of the antitrust laws, neither was it meant to *create* antitrust liability where none existed previously. In short, PURPA was designed to be antitrust-neutral. As it states, it does not directly affect the applicability of the antitrust laws one way or the other.

This conclusion is also reinforced by the legislative history of PURPA, which reveals that Congress's motive in creating PURPA was not to foster competition in the utility industry, but to deal with a perceived energy crisis.

The Supreme Court analyzed the legislative history and objectives of PURPA at some length in *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). The Court noted that at the time PURPA was enacted, "[c]ommittees in both Houses of Congress noted the magnitude of the Nation's energy problems and the need to alleviate those problems by promoting energy conservation and more efficient use of energy resources. Congress was aware that domestic oil production had lagged behind demand and that the Nation had become increasingly dependent on foreign oil." *Id.* at 756, 102 S.Ct. at 2135–36 (citations omitted). The Court also noted that PURPA's provisions encouraging the development of cogeneration facilities were intended to "reduce the demand for traditional fossil fuels." *Id.* at 750, 102 S.Ct. at 2132. "Congress also determined that the development of cogeneration and small power production facilities would conserve energy." *Id.* at 757, 102 S.Ct. at 2136.

Thus, it is clear that the policies underlying PURPA are quite distinct from those underlying the antitrust laws. PURPA was created as a vehicle to reduce the nation's dependency on foreign oil and to conserve energy, not to foster competition.

Arguably, of course, the encouragement of the creation and development of cogeneration facilities and other alternative-energy sources would also promote competition in the power industry, inasmuch as new energy producers would enter the market. Nonetheless, it cannot be gainsaid that, while increased competition might be a *byproduct* of PURPA, it is not its *purpose.* In enacting PURPA, Congress was not concerned with fostering competition for competition's sake, but with energy conservation. As another court put it in a case also involving both PURPA and the antitrust laws:

In establishing PURPA, ... Congress did not intend to place qualifying facilities in competition with public utilities. To the contrary, Congress has sought to encourage the development of qualifying facilities by insulating them from competition.... In general, qualifying facilities produce a component which is used by public utilities and consume utility service; but, they are not competitors of public utilities.

*Greensboro Lumber Co. v. Georgia Power Co.,* 643 F.Supp. 1345, 1373 (N.D.Ga.1986), *aff'd,* 844 F.2d 1538 (11th Cir.1988).

Although it does not appear that any reported case has yet dealt with the precise type of antitrust claim raised in this case, there are some cases that have discussed the relationship between PURPA and the antitrust laws. In *Environmental Action, Inc. v. FERC,* 939 F.2d 1057 (D.C.Cir.1991), several parties petitioned the court to set aside a FERC decision that approved a merger between two power companies on the condition, *inter alia,* that the new firm would be required to "wheel," *i.e.* transmit, power for any utility that requested it, other than QFs. The court held that the exclusion of QFs from the wheeling requirement was arbitrary and capricious, and remanded to FERC for further consideration.

One rationale advanced by FERC for excluding QFs was that affording QFs mandatory wheeling access would give them an unwarranted competitive preference over other utilities by enabling QFs to force distant utilities other than their own "native" utility (such as RG & E is to Kamine) to buy their power. The court found this unpersuasive because under PURPA, a "QF may force a sale only at the purchasing utility's avoided cost." *Id.* at 1061 (citing 16 U.S.C. § 824a–3(d)). Thus, the court reasoned, a QF would only have an advantage over its competitors if it produced energy at a lower cost than they did; that might harm the QF's *competitors*, but not *competition*. The court also noted that "such advantage as a QF may have stems directly from the Congress's policy choice to encourage the sale of power by QFs rather than by traditional utilities." *Id.* at 1062.

Several points raised by the *Environmental Action* court are particularly salient with respect to the instant case. The first is the court's reasoning that QFs would not have an unfair advantage over other utilities because under PURPA, QFs could charge *no more* than the buyer's avoided cost. That, however, is exactly the opposite of the situation in the case at bar. Here, the avoided cost is precisely what RG & E seeks to pay. It is Kamine that wants to force RG & E to pay *more* than its avoided cost by using the LRACs that have long since been recognized as grossly inflated. It is obvious that what the court was saying in *Environmental Action* was that allowing QFs wheeling access would not hurt competition because they could not charge more than the buyer's *actual* avoided cost, *i.e.*, the price charged by the QFs' competitors. If a QF could not produce energy as efficiently as its competitors, it would actually find itself at a disadvantage.

In contrast, to allow a QF, such as Kamine, to charge more than the buyer's actual avoided cost would give it a leg up on non-QF producers. The QF could produce energy relatively less efficiently and still make the same or a greater profit than its competition because the buyer would be forced to pay an above-market price.

■ Of course, such protection is to some extent envisioned by PURPA. Again, however, it must be borne in mind that this case is not about PURPA directly, but about the antitrust laws, which are meant to protect competition, not individual competitors. *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir.1995) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). However consonant with PURPA's aims it may be to shield a QF like Kamine from price competition, that end is not something that the antitrust laws were designed to protect.

That, in fact, is the second noteworthy point about the *Environmental Action* decision. The court noted that the interests served by PURPA's special protection of QFs "may *or may not* be wholly consistent with the antitrust laws ..." *Id.* (emphasis added). However, the court added, "being specifically relevant to th[at] case it deserve[d] at least as much consideration as the general interests embodied in the antitrust laws ..." *Id.* FERC, the court said, had not considered the interests served by PURPA at all. *Id.*

This reasoning, though compelling under the facts of *Environmental Action,* was expressed in the context of a situation quite distinguishable from the case at bar. *Environmental Action* involved a decision by FERC—an agency expressly charged in PURPA with the enforcement of that Act, *see* 16 U.S.C. § 824a–3—to approve a merger of utility companies. As a primary enforcer of PURPA, FERC obviously could not ignore the policies underlying that statute. The instant case, on the other hand, is grounded in the antitrust laws. Conversely to *Environmental Action,* then, while the policies underlying PURPA may not be irrelevant to this action, it is the interests sought to be advanced by the antitrust laws that are of paramount importance here.

The district court's decision in *Greensboro Lumber,* 643 F.Supp. 1345, contains an extensive and penetrating analysis of the interplay between PURPA and the antitrust laws. In *Greensboro Lumber,* a lumber company that operated a cogeneration facility alleged

that the defendants, various electricity producers and buyers, had acted improperly both in response to its attempts to sell power to them, and in response to its requests to purchase back-up power from them. The plaintiff alleged that certain power sales contracts among the defendants precluded it from competing in the energy transmission and wholesale markets, in violation of both the antitrust laws and PURPA.

The district court granted the defendants' motion for summary judgment, laying considerable stress on the fact that the plaintiff insisted on charging prices for its excess energy which were considerably higher than the defendants' avoided costs. Noting that Congress had expressly provided in PURPA that utilities should not pay QFs a price in excess of the utility's avoided cost, *see* 16 U.S.C. § 824a–3(b), the court stated that

> [t]his provision was enacted because PURPA was 'not intended to require the ratepayers of a utility to subsidize cogenerators or small power producers.' H.R.Rep. No. 1750, 95th Cong., 2d Sess. at 98, reprinted in 1978 U.S.Code Cong. & Ad.News at 7832. The congressional purpose in limiting the price to qualifying facilities was to ensure that PURPA did not become a utility-funded welfare program for qualifying facilities, since such 'funding' would essentially come from the pockets of electric consumers.

*Id.* at 1369 n. 30.

The court also pointed out that one of the defendants, Oglethorpe, had offered to buy the plaintiff's excess energy at the same rate that Oglethorpe paid Georgia Power, its main supplier, under FERC-approved tariffs, but that the plaintiff had refused. The court said that

> [i]t flies in the face of reason to think that either Oglethorpe or the EMCs [the cooperatives which together comprised Oglethorpe] would be willing to pay Greensboro more for its energy and capacity than it could pay to Georgia Power for equivalent power. Nothing in the antitrust laws re-

quires the Oglethorpe Group to pay Greensboro more for its power when the same power may be purchased from Georgia Power or others for less.... Having been offered a price which is above the market rate as a result of FERC's regulations,[4] Greensboro is in no position to demand a still higher price under any antitrust theory.

*Id.* at 1368–69.

In addition to these cases, a number of other antitrust cases not involving utilities have held that refusing to pay an above-market price does not constitute antitrust activity. As noted earlier, PURPA does not affect the applicability of the antitrust laws. 16 U.S.C. § 2603(1). Thus, the principles set forth in these antitrust cases, which involve a variety of factual situations, are no less applicable here than they would be in any other antitrust case.

In *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 279, 88 S.Ct. 1575, 1587–88, 20 L.Ed.2d 569 (1968), for example, a Sherman Act case, the Supreme Court, affirming summary judgment for the defendant on the plaintiff oil dealer's boycott claim based on the oil company's refusal to purchase plaintiff's oil at a specified price, stated that "[o]bviously it would not have been evidence of conspiracy if [defendant] refused to deal with [plaintiff] because the price at which he proposed to sell oil was in excess of that at which oil could be obtained from others."

Likewise, in *AT & T v. Delta Comm. Corp.*, 408 F.Supp. 1075, 1101 (S.D.Miss. 1976), *aff'd*, 579 F.2d 972 (5th Cir.1978) (per curiam), *aff'd on rehearing*, 590 F.2d 100 (5th Cir.1979), the district court stated that where an alleged anticompetitive conspiracy "is predicated on a failure to buy a service worth money for a moneys worth price, the plaintiff has the burden of demonstrating that his product has some value above the price paid or offered." The court further refused to recognize any "inference of conspiracy or anticompetitive activity" arising out of "a re-

4. The court noted that under "pure" market conditions, a seller would ordinarily have to offer a price somewhat lower than the price that the buyer is paying to his current supplier; otherwise, the buyer would have no incentive to switch suppliers. FERC-mandated prices are therefore above-market in comparison with pure market prices. *Id.* at 1368 n. 28.

fusal to buy a product or service for more than it is worth," *id.* at 1090 n. 29, stating that any additional payment "would have been a gift," and that the "Sherman Act does not command gratuitous compensation." *Id.* at 1092.

The fact that the utility industry is highly regulated by the state and federal governments is also significant. Several courts have expressed the view that the ability of government regulation to keep monopolization power in check tends to minimize whatever dangers to the public might otherwise exist as a result of anticompetitive activity. *Westchester Radiological Associates P.C. v. Empire Blue Cross and Blue Shield,* 707 F.Supp. 708 (S.D.N.Y.), *aff'd,* 884 F.2d 707 (2d Cir.1989) (per curiam), for example, was an antitrust action by hospital-based radiologists against an insurance company, whose contracts with its client hospitals provided that the radiologists could not bill patients directly for their services, but were limited to the amounts paid by the insurer to the hospitals for those services. The plaintiffs alleged that this arrangement "unnaturally" limited how much they could charge for their services. The court granted summary judgment for the insurer, stating that the insurer was "simply acting as a rational buyer attempting to get the best possible terms for its subscribers." *Id.* at 713. Noting that the state set the reimbursement rate that the insurance company could pay to hospitals for patient care, the court said that "[t]he state's supervision suggests that novel judicial applications of antitrust law are unlikely to be required to prevent Blue Cross from abusing its market power." *Id.* at 714.

The court in *Kartell,* 749 F.2d 922, expressed similar views in an action brought by physicians who claimed that the defendant insurance company's ban on "balance billing," *i.e.* billing a patient for amounts over the amount of the insurer's payment to the physician, violated the Sherman Act. Vacating the district court's injunction in favor of the plaintiffs, the court stated that "where monopoly power is regulated, the regulator, not the court, bears the burden of determining whether prices are reasonable." *Id.* at 928 (citing as examples state statutes pertaining

to regulation of gas and electric rates). The court pointed out that "the price system here at issue is one supervised by state regulators," and that "[w]hile that fact does not automatically carry with it antitrust immunity, it suggests that strict antitrust scrutiny is less likely to be necessary to prevent the unwarranted exercise of monopoly power." *Id.* at 931 (citation omitted). The court concluded that the insurance company, as a buyer of the physicians' services on behalf of its customers, "seem[ed] simply to be acting 'as every rational enterprise does, *i.e.,* [to] get the best deal possible.' " *Id.* at 929–30 (quoting *Travelers Ins. Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80, 84 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973)).

The same principles apply here. As stated, the utility industry is heavily regulated by both the state and federal governments. Historically, those governments have allowed some monopoly power to exist in the industry, and that is probably part of the reason why prices in particular are subject to government regulation and approval. *See, e.g.,* N.Y.Pub.Serv.L. § 66 (setting forth powers of PSC with respect to rates). As the courts stated in *Kartell* and *Westchester Radiological Associates,* that supervisory power suggests that an expansive application of the antitrust laws is not appropriate here.

■ I conclude, therefore, that Kamine has not shown a likelihood of success on the merits in this action. It simply does not appear that the effect of RG & E's refusal to pay *more* than its actual avoided cost would have an anticompetitive effect. "The antitrust laws do not prohibit a buyer from bargaining for the best deal possible." *Brillhart v. Mutual Med. Ins. Inc.,* 768 F.2d 196, 201 (7th Cir.1985). That is all that RG & E is seeking to do—get the best deal possible under *market, i.e.,* competitive, conditions. The PPA, which Kamine is attempting to enforce, was not created as a result of market forces or a competitive process; it is a creature of a statutory scheme set up for reasons that have nothing to do with competition *per se.* From an economic standpoint, the PPA is little more than a "shotgun mar-

riage" in which the PSC was holding the trigger.

As I noted in my TRO decision, the PPA does not allow RG & E simply to walk away from the contract, but requires it to seek judicial review. That, however, is what RG & E is now attempting to do in state court. At any rate, whether RG & E has breached the PPA or not, Kamine has not sufficiently demonstrated an *antitrust* injury to warrant issuance of the injunction it seeks. The requested injunction might protect a competitor, but it is difficult to see how it would protect competition.

The fundamental dispute between the parties, then, concerns the interpretation and enforceability of the PPA. Those are matters relating to PURPA and to common-law contract principles. The mere fact that one of the parties to this dispute is a utility with a state-sanctioned monopoly does not automatically transform this contract dispute into an antitrust matter. There has to be a showing of unlawful, anticompetitive behavior, and on the evidence presented, I do not find a likelihood that Kamine will succeed in making that showing.

*V. Bond Requirement Under Fed.R.Civ.P. 65(c)*

Additionally, I note that under Rule 65(c) of the Federal Rules of Civil Procedure, "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Although I dispensed with the bond requirement in my TRO decision, I did so principally on the ground that the relatively short duration of the order meant that any possible overpayment by RG & E "during this purely temporary period of injunctive relief [wa]s unlikely to be so substantial that it could not be rectified at a later date." Decision and Order, Mar. 20, 1995, at 31. I also noted that Kamine was financially not in a position to post a bond satisfactory to RG & E. *Id.* At oral argument on the preliminary injunction motion, Kamine reaffirmed that a bond

which would protect RG & E in the event that the injunction were found to have been improvidently granted would have to be so large that "we [*i.e.*, Kamine] can't post it."

Although it is not my primary reason for denying Kamine's motion for a preliminary injunction, I believe that Kamine's inability to post a bond adds further support to my decision. As noted, the main reason for waiving a bond in the TRO was that the relief would be of short duration. As I stated at oral argument of the preliminary injunction motion, however, the matter remained "still of concern" to me, and I considered it "still a very viable issue here."

That concern is heightened by the fact that a preliminary injunction might remain in effect for a considerable period of time. Although the parties have stipulated so far to have the TRO remain in effect pending my decision on the motion for an injunction, absent such a stipulation a TRO ordinarily expires within ten days. Fed.R.Civ.P. 65(b). Preliminary injunctions, however, have no such time limit, and in fact are of "potentially unlimited duration." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters Local 70,* 415 U.S. 423, 432 n. 7, 94 S.Ct. 1113, 1121 n. 7, 39 L.Ed.2d 435 (1974). The alleged harm here to RG & E—paying more than it should for power from Kamine—is not constant, but continues to increase with each passing day, as the total alleged overpayment mounts higher. That situation also increases the possibility that, in the event that the injunction is later found to have been improvidently granted, the amount owed to RG & E by Kamine will have grown so large that it will be impossible for RG & E to be made whole. The danger of that happening, then, simply adds to the factors weighing against granting the injunction in this case.

### CONCLUSION

Plaintiff's motion for a preliminary injunction is denied in part and granted in part.

Plaintiff's motion for a preliminary injunction is denied in all respects except to the extent that defendant, RG & E, has agreed

to purchase power from plaintiff, *pendente lite*, at the current tariff rate (SC5 rate).[5]

IT IS SO ORDERED.

---

**5.** RG & E has maintained throughout the pendency of the preliminary injunction motion that it is willing to purchase power from Kamine at its actual avoided cost as measured by the SC5 rate. *See, e.g.,* RG & E's Sur–Reply Memorandum in Opposition to Plaintiff's Motion at 17. That willingness has also been a substantial factor in my decision to deny Kamine's motion for a preliminary injunction, particularly with respect to the issue of irreparable harm.