**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 10 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TELECOR COMMUNICATIONS, INC.,
an Oklahoma corporation; ADVANCED
COMMUNICATIONS, INC., an
Oklahoma corporation; COINLINK LLC,
an Oklahoma limited liability company;
JACK KEELER, d/b/a Americall;
KENNETH MERITT, d/b/a Oklahoma
Heartland Payphone Services; DON
OWENS, d/b/a Owens Communications
Company; PAYPHONE PLUS LLC, an
Oklahoma limited liability company;
REDLANDS COMMUNICATIONS,
INC., an Oklahoma corporation; and
SOONER TELECOMMUNICATIONS,
INC., an Oklahoma corporation;

    Plaintiffs - Appellees,

v.

SOUTHWESTERN BELL TELEPHONE
COMPANY, a Missouri corporation,

    Defendant - Appellant.

Nos. 01-6067 and 01-6138

**Appeal from the United States District Court**
**for the Western District of Oklahoma.**
**(D.C. No. 98-CV-1249-C)**

Donald L. Flexner, Boies, Schiller & Flexner LLP, Washington D.C. (D. Kent
Meyers and Richard C. Ford, Crowe & Dunlevy, Oklahoma City, OK, Scott E.
Gant, Boies, Schiller & Flexner LLP, Washington, D.C., and David A. Barrett,

Boies, Schiller & Flexner LLP, New York, NY, with him on the briefs), for Defendant-Appellant.

Robert D. Edinger (Jonathan E. Miller and Linda G. Kaufmann, with him on the briefs), Edinger & Blakley, P.C., Oklahoma City, OK, for Plaintiffs-Appellees.

---

Before **EBEL** and **KELLY**, Circuit Judges, and **WINDER**,[*] Senior District Judge.

---

**EBEL**, Circuit Judge.

---

Southwestern Bell Telephone Company appeals from a jury verdict finding it guilty of monopolistic behavior in violation of Oklahoma state law and assessing damages of over $7 million, trebled to over $20 million. At issue is Southwestern Bell's domination of the Oklahoma pay phone market, a market it legally monopolized, under the oversight of the Oklahoma Corporation Commission (OCC), until November 1996. The plaintiffs are nine independent pay phone service providers whose efforts to compete with Southwestern Bell succeeded only in whittling down the latter's market share to roughly 80 percent after two years of competition. On appeal, Southwestern Bell challenges several aspects of the district court's rulings, most notably its definition of the relevant market. While we do not embrace the district court's analysis in its entirety, we

---

[*]  The Honorable David K. Winder, Senior District Judge, United States District Court for the District of Utah, sitting by designation.

nevertheless believe that the challenged rulings were proper, and we therefore **AFFIRM**.

## BACKGROUND

In the decades up until November 1996, Southwestern Bell enjoyed a legal monopoly over the provision of pay phone services in the state of Oklahoma. As early as 1990, the Oklahoma legislature had decided to move from monopoly to competition in this market, but it entrusted the implementation of that transition to the OCC, which failed to end Southwestern Bell's monopoly until passage of the 1996 Telecommunications Act, 47 U.S.C. § 276(b), forced its hand. After a four-month rulemaking proceeding, the OCC authorized new pay phone providers in November 1996, subject to certain regulatory requirements.

Pay phone service providers ("PSPs") such as Southwestern Bell and the Plaintiffs typically do not own the land on which the pay phones are located. Rather, they make a deal with the party that owns the land ("location owner"): the PSP gets permission to place the pay phone on the location, and in exchange the location owner gets a commission, typically a percentage of the phone's receipts.

The Plaintiffs' evidence at trial showed that, prior to the Oklahoma legislature's 1990 decision to end its pay phone monopoly, Southwestern Bell had projected that it would lose 77 percent of its pay phone revenues in the first year

of open competition. (The facts discussed here were disputed at trial and are presented in the light most favorable to the Plaintiffs.) In response, in 1991 Southwestern Bell undertook an intentional campaign to make entry into the Oklahoma pay phone market more difficult by attempting to secure every possible pay phone location through long-term contracts between Southwestern Bell and the location owners. This "lock up" campaign continued through 1996 and accelerated dramatically with what Southwestern Bell termed "the Blitz" in 1995-96 on the eve of the coming of competition.

The contracts contained several provisions designed to freeze out Southwestern Bell's competitors, including automatic renewal terms and stiff penalties for early termination.[1] In addition to the lock up, Southwestern Bell employed several other measures to freeze out competition, including erecting a bureaucratic maze to discourage location owners who tried to terminate their contract, failing to remove its pay phones when requested to do so, and damaging the pay phone location when removing a phone.[2]

---

[1] According to one witness, early termination fees could be as high as $7,200 on a location that might be paying the location owner only about $200 a year in commissions.

[2] By way of further example, many of Southwestern Bell's contracts called for a 50% reduction in the commissions payable by Southwestern Bell to the location owner if the location owner allowed competitive pay phones on its location alongside Southwestern Bell's pay phones. This was tantamount to precluding competitive pay phones because, in the unlikely event that the

(continued...)

Southwestern Bell's anti-competitive actions were highly successful. Although its competitors offered better commissions to location owners and better phones at cheaper rates to customers, at the end of the second year of competition Southwestern Bell retained more than 87 percent of the market, with no single competitor above 2.4 percent.

The Plaintiffs filed suit against Southwestern Bell claiming violations of federal and state antitrust law. The district court issued four different written decisions, two pre-trial and two post-verdict. The first order, filed March 1, 2000, dealt with the relevant product market pursuant to cross-motions for summary judgment. The Plaintiffs argued that the relevant market was the provision of pay phone facilities and services to location owners. Southwestern Bell argued that the product market should be evaluated from the viewpoint of the end-user of the phone services and should therefore include both pay phones and cell phones, which Southwestern Bell argued were reasonably interchangeable at the end-user level. The district court did not address whether the market should be evaluated at the level of the location owners or at the level of the end-users,

_____

[2](...continued)
additional phones would increase total revenues for that location (there was evidence that Southwestern Bell would usually already have placed the optimal number of phones at a given location), the location owner would receive a much smaller percentage of those revenues. The damage Southwestern Bell did to the property when withdrawing its phones also made the property less attractive to providers of competitive pay phones.

but it did rule that pay phones and cell phones were not reasonably interchangeable, and thus, that the market should be limited to pay phones. Ultimately, the jury instructions submitted by the district court defined the relevant market simply as "the provision of pay phone and pay phone related services" without differentiating whether it should be evaluated at the level of the location owners or at the level of the end-users. Southwestern Bell does not claim to have objected to this instruction, so it is clear that the parties allowed the jury to determine which set of customers should be used in evaluating monopoly power.

The second order, filed March 23, 2000, addressed various motions in limine, none at issue on appeal. The third order, filed January 31, 2001 (after the jury found Southwestern Bell liable for state antitrust violations but not liable for federal antitrust violations), rejected Southwestern Bell's motion for a new trial on the issue of damages. The central contention addressed in that order was whether the damages awarded were based improperly on anticipated future illegal conduct. The fourth order, also filed January 31, 2001, rejected Southwestern Bell's motion for judgment as a matter of law or new trial. That motion argued, inter alia, that the jury improperly was allowed to consider Southwestern Bell's lobbying efforts before the OCC and its pre-November 1996 conduct, that the verdict failed to account for the temporary contractual nature of Southwestern

Bell's market power, and that the verdict violated the state action doctrine. Southwestern Bell appeals the district court's resolution of all of these issues.

**DISCUSSION**

The district court had jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. § 1337 and over the state antitrust claims pursuant to 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

**A.     Relevant Product Market**

The first step in analyzing a monopoly claim is to define the relevant market in which the defendant was operating. See Full Draw Prods. v Easton Sports, Inc., 182 F.3d 745, 756 (10th Cir. 1999); SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 966 (10th Cir. 1994). The relevant market inquiry has two components: geographic market and product market. Full Draw Prods., 182 F.3d at 756. Only the latter is at issue in this appeal. Southwestern Bell contends that the relevant product market should include cell phones as well as pay phones, while the Plaintiffs argue that the market is limited to pay phones. The parties' underlying interests in this regard are conflicting: Southwestern Bell wishes to define the market as broadly as possible (which would make it more difficult for a jury to find that it exercised monopoly power), and the Plaintiffs wish to define

the market as narrowly as possible (which would make it easier to find monopoly power). The parties filed cross-motions for summary judgment on market definition, and the court granted the Plaintiffs' motion, ruling that cell phones were not part of the relevant market.

We have previously explained the relevant product market analysis as follows:

> The market power query begins with the determination of the relevant market, that is, a market relevant to the legal issue before the court. The market which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced--price, use and qualities considered. We also look to the geographic reach of the group of sales or sellers to determine the relevant market. Further, because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the relevant market rests on a determination of available substitutes.

>> To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume.

> Although these concepts provide a shorthand for rule of reason analysis, we would be amiss to imply their application is necessarily facile. Each may be problematic:

>> There is no subject in antitrust law more confusing than market definition. One reason is that the concept, even in the pristine formulation of economists, is deliberately an attempt to oversimplify--for working purposes--the very

> complex economic interactions between a number of differently situated buyers and sellers, each of whom in reality has different costs, needs, and substitutes. . . .
>
> By defining the relevant market, however, we identify the firms that compete with each other. Plugged into the market power inquiry, we may then determine whether the alleged anticompetitive activity restrained trade, that is, raised price or reduced output.

SCFC ILC, Inc., 36 F.3d at 966 (internal quotation marks, citations, and alterations omitted). It is well settled that defining the relevant market is an issue of fact, Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1220 (10th Cir. 1986), but we review the district court's grant of summary judgment on that issue de novo. Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

Most of the district court's discussion of the relevant product market issue was devoted to explaining why Southwestern Bell's submissions on this issue (arguing that the relevant market included cell phones) were unpersuasive. However, although the inadequacies of Southwestern Bell's relevant market evidence do support the district court's denial of Southwestern Bell's motion for summary judgment on the relevant market issue (which denial Southwestern Bell does not challenge on appeal), they do not support the court's grant of summary judgment on the issue in favor of the Plaintiffs. Because the Plaintiffs had the burden of proof on the relevant market issue, Tarabishi v. McAlester Reg'l Hosp., 951 F.2d 1558, 1569 n.15 (10th Cir. 1991), the Plaintiffs were obligated to make

an affirmative showing of their proposed relevant market sufficient to sustain a reasonable jury finding. See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." (internal quotation marks omitted)).

The district court's belief that the Plaintiffs had satisfied their burden was based on its view that certain consumers would not purchase cell phones no matter how much Southwestern Bell raised the rates for pay phone services. We do not believe that such an assertion, even assumed to be true, justifies excluding cell phones from the relevant product market (assuming for the moment that the product market has to be evaluated at the end-user level).

The basic relevant product market test is "reasonable interchangeability." SCFC, 36 F.3d at 966. Interchangeability may be measured by, and is substantially synonymous with, cross-elasticity. Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); Westman Comm'n Co., 796 F.2d at 1221. A market is elastic if demand goes down as price goes up. A market is cross-elastic if rising prices for product *A* cause consumers to switch to product *B*.

The district court held that, because "common sense" suggests that there exist some people (namely, poor people who use pay phones because they have no phone service at home or work) who would not switch to cell phones if pay phone prices increased, therefore Southwestern Bell's definition of the relevant product market to include cell phones was illogical. The problem with that reasoning is that neither the court below nor the parties on appeal cite anything in the record to support a conclusion that the number of "non-cross-elastic" pay phone users was significant enough to render the market as a whole non-cross-elastic. (Indeed, neither the court below nor the parties in the briefing point to anything in the record to support the district court's conclusion that non-cross-elastic pay phone users exist at all, although surely some must.) Thus, this is not a case where the summary judgment movant (the Plaintiffs) alleged record-supported facts which the non-movant (Southwestern Bell) failed to rebut.

Therefore, the district court's belief that there are non-cross-elastic pay phone users does not provide a sufficient basis for granting summary judgment in favor of the Plaintiffs as to the scope of the relevant market. The remainder of the district court's stated basis for its ruling is equally unavailing:

> [A]lthough cell phones and pay phones perform similar functions, these items are not reasonably interchangeable. Local calls may be made on a pay phone for approximately thirty-five cents. A pay phone user does not need to make the financial or contractual commitment associated with cellular telephone service. A pay phone is stationary and available

to anyone in the vicinity. In contrast, a cell phone is available only to those in possession of such equipment.

Reasonable interchangeability does not depend upon product similarity, a point well summarized in the ABA's treatise on antitrust law:

> Many courts have addressed the situation where two or more products or services have similar functions but different physical characteristics. These cases make clear that the relevant inquiry remains whether the differences in type render the products poor substitutes and that the resolution of this question depends on the evidence in the case. In du Pont, for example, the Court concluded that all flexible wrappings belonged in the same market, notwithstanding differences in burst strength, gas permeability, grease resistance, and other factors. The Court based its conclusion upon the extensive competition that existed between cellophane and other pliable wrappings, despite cellophane's physical advantages.

1 ABA Section of Antitrust Law, Antitrust Law Developments 508 (4th ed. 1997). Although the product differences cited by the court below are all reasons that the jury might rely upon were it to find that the relevant market did not include cell phones, we cannot agree that such differences support summary judgment on this factual issue.

However, regardless of the interchangeability of pay phones and cell phones at the end-user level, there is no doubt that pay phones and cell phones are not interchangeable at the location-owner level, and that is the level where the Plaintiffs argued that Southwestern Bell has monopolized competition. In other words, the Plaintiffs argue that Southwestern Bell's interchangeability argument is wrongly directed at showing that cell phones and pay phones are

interchangeable for end-users, but that is not the market where the Plaintiffs are complaining of Southwestern Bell's anti-competitive behavior. Rather, it is the location owners who define the market where the anti-competitive behavior took place – that is, the Plaintiff's claim that they compete with Southwestern Bell for locations upon which to place their pay phones, and that is the market Southwestern Bell has monopolized.

Southwestern Bell insists that, despite the fact that it competes with the Plaintiffs in supplying pay phones to location owners, the end-user market for telephone services must still be considered. In support of this assertion, Southwestern Bell first argues that "market power must be identified from [the consumer's] perspective." The only support Southwestern Bell offers for this assertion is United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377 (1956). But du Pont does not support the proposition for which it is cited; the Court there merely stated that "[i]n considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal." Id. at 395 (internal quotation marks omitted). The reference to consumers makes perfect sense in du Pont given that the market at issue (sale of cellophane wrap and other flexible wrappings) indisputably was a consumer

market. Although Southwestern Bell is correct that antitrust laws were "especially intended to serve consumers," that hardly suffices to prove that a monopolist may act with impunity so long as end-use consumer prices are unaffected. And, in any event, the Plaintiffs' antitrust theory was that the location owners were consumers of the placement of pay phone facilities on their locations, and that the price for such location placements was affected by Southwestern Bell's monopolistic conduct.

Southwestern Bell also argues that the relevant market should include the end-user market (and thus include cell phones) because pay phone service providers like Southwestern Bell are properly viewed as buyers rather than sellers in their relationships to location owners. That is, Southwestern Bell argues that the location owners are not "customers" of Southwestern Bell at all; Southwestern Bell argues that it is the customer of the location owners.[3]

Thus, Southwestern Bell attempts to characterize this action as a "monopsony" claim.[4] A monopsony, Southwestern Bell argues, is not actionable

---

[3] The contracts themselves do not establish whether Southwestern Bell is more properly viewed as the buyer or seller, providing simply that the location owner, in exchange for prescribed commission payments, "hereby grants SWBT the right to install and maintain SWBT public pay telephone(s) and associated equipment . . . at the location specified herein," and that the phone remains the property of Southwestern Bell during the contract period.

[4] "Monopsony" is a "condition of the market in which there is but one buyer for a particular commodity." Black's Law Dictionary 1007 (6th ed. 1990).

unless it "injure[s] consumers by forcing up the price of the end product. Where the risk of that happening is slight or nonexistent, however, monopsony power per se does not create an antitrust concern." Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp., 908 F. Supp. 1194, 1203 (W.D.N.Y. 1995). Thus, because the end-users' ability to switch from pay phones to cell phones prevented them from being harmed by Southwestern Bell's monopsony,[5] Southwestern Bell contends that its conduct is not actionable.

On its merits, Southwestern Bell's monopsony argument is unpersuasive. The Supreme Court's treatment of monopsony cases strongly suggests that suppliers (under Southwestern Bell's theory of the market, the location owners) are protected by antitrust laws even when the anti-competitive activity does not harm end-users. In its leading monopsony case, the Supreme Court stated:

> It is clear that the [anti-competitive buyer's price-fixing] agreement is the sort of combination condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers.
>
> . . . .
>
> The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. The Act is comprehensive in its terms and coverage, protecting all who are made

---

[5] As stated earlier, at least on this record, the Plaintiffs have not yet demonstrated that cell phones and pay phones are not reasonably interchangeable at the end-user level.

- 15 -

> victims of the forbidden practices by whomever they may be perpetrated.

Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 235-36 (1948) (citations omitted). In Mandeville Island Farms, the Court held that the plaintiff sugar beet growers had stated a valid monopsony claim under § 2 of the Sherman Act against a sugar beet buyer who colluded with other buyers to pay uniform prices for beets. Significantly, as the two dissenting justices observed, the plaintiffs' complaint did not allege that the defendants' actions affected end-user prices. Id. at 247-48 (Jackson, J., dissenting).

Tenth Circuit case law also appears to reject the notion that a monopsony plaintiff must prove end-user impact. In Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951 (10th Cir. 1990), we rejected a monopsony defendant's argument that injury to sellers without injury to end-users is not cognizable antitrust injury. Id. at 962; cf. Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 579-80 (10th Cir. 1961) ("[T]he prolonged existence of a price-fixing conspiracy [by buyers] in an integrated industry such as ours is proof of damages to those [parties] whose prices are directly affected thereby. In that respect, our case is noticeably akin to Mandeville Island Farms v. American Crystal Sugar, 334 U.S. 219."). This approach is consistent with the case law of other circuits. See Khan v. State Oil Co., 93 F.3d 1358, 1361 (7th Cir. 1996) (Posner, J.) ("This is a form of monopsony pricing, which is analytically the same as monopoly or

cartel pricing and so treated by the law. E.g., Mandeville Island . . . ." (dicta)),

vacated on other grounds, 522 U.S. 3 (1997); United States v. Syufy Enters., 903

F.2d 659, 663 (9th Cir. 1990) ("[I]t is theoretically possible to have a middleman

who is a monopolist upstream but not downstream . . . .").

An especially insightful analysis of relevant market analysis in monopsony

cases comes from the Second Circuit. In Todd v. Exxon Corp., 275 F.3d 191 (2d

Cir. 2001), the plaintiffs were managerial, professional, and technical employees

who brought a Sherman Act § 1 suit against fourteen major oil companies,

alleging that the companies shared information about, and thereby artificially

depressed, the salaries paid to such classes of employees. Id. at 195. The

relevant market issue in Todd was slightly different than that at issue here, but the

language used by the court in addressing that issue is directly relevant here. In

Todd, the district court had held that the market proposed by the plaintiffs was

over-inclusive to the extent that the plaintiffs had failed to show that the various

types of employees within the asserted relevant market (accountants, lawyers,

engineers, etc.) were interchangeable with one another. Id. at 201. The Second

Circuit rejected this conclusion:

> [T]he market is not the market of competing sellers [the employees
> selling their services] but of competing buyers [the companies buying
> these services]. This market is comprised of buyers who are seen by
> sellers as being reasonably good substitutes. A greater availability of
> substitute buyers indicates a smaller quantum of market power on the
> part of the buyers in question.

- 17 -

. . . . Plaintiff is right to urge that the proper focus is . . . the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers. The question is not the interchangeability of, for example, lawyers with engineers. At issue is the interchangeability, from the perspective of a [managerial, professional, or technical] employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry.

Id. at 202 (citations omitted).

Opinions from other courts, as well as the writings of economists, reinforce this view. As Judge Wald summarized in a dissenting opinion:

The Supreme Court has clearly held that antitrust laws apply not only to restraints on output markets, but to input markets as well, including both labor, [citation omitted], and input commodities, e.g., [Mandeville Island Farms] (sugar refiners' agreement to fix input prices paid for sugar beets violates Sherman Act, which "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers" but instead "is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated"). See also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940) (Sherman Act prohibits any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity" and agreements to make "purchases [of inputs] at or under the market are one species of [unlawful] price-fixing"); American Tobacco Co. v. United States, 328 U.S. 781 (1946) (applying antitrust law to restraints on input market for tobacco as well as output market for tobacco products); Swift & Co. v. United States, 196 U.S. 375 (1905) (same, for livestock inputs and meat outputs). Cf. National Macaroni Mfr's Ass'n v. Federal Trade Comm'n, 345 F.2d 421, 426 (7th Cir.1965) (purpose and effect of agreement to fix composition of macaroni product was to depress input price of semolina, thereby violating Sherman Act).

Economists too have long recognized that market inefficiencies created by anticompetitive restraints on input markets can be as destructive of a free market economy (and therefore ultimately damaging to consumers) as restraints on output markets. See, e.g.,

- 18 -

ROGER D. BLAIR & JEFFREY L. HARRISON, MONOPSONY 36-43 (1993); see also Mandeville Farms, 334 U.S. at 241-44 (describing how restraints on input market adversely affect output market). While antitrust prosecutions for restraints on input markets are relatively rare, this is explained by the fact that restraints on input markets arise only in the unusual circumstance of an effective monopsony--a single purchaser, or a group of purchasers acting in concert. And monopsony in turn arises only when the resource is uniquely valuable in its current use, so that even if the price is depressed by monopsony, sellers are unable to find alternative buyers. RICHARD A. POSNER & FRANK H. EASTERBROOK, ANTITRUST 150 (1981) (monopsony can arise when "resources hav[e] substantially greater value in some uses than in others" so the "sole purchaser . . . will . . . be able to force the [seller] . . . to accept a monopsony price"); BLAIR & HARRISON, supra, at 43-44 (inelasticity of supply facilitates collusive monopsony). Thus, for example, in the Mandeville Island Farms case, the sugar refiners' monopsonistic price-fixing scheme was effective because growers could not easily find other buyers or profitably switch to other crops when refiners conspired to fix the price of sugar beets. See 334 U.S. at 240-42. Nonetheless, according to the economists, there is a dead-weight loss associated with imposition of monopsony pricing restraints. Some producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products. See, e.g., HERBERT HOVENKAMP, ECONOMICS AND FEDERAL ANTITRUST LAW § 1.2, at 17-18 (1985); BLAIR & HARRISON, supra, at 42-43, 72. So, even proceeding from the premise that antitrust laws aim only at protecting consumers, monopsonies fall under antitrust purview because monopsonistic practices will eventually adversely affect consumers.

Brown v. Pro Football, Inc., 50 F.3d 1041, 1061 (D.C. Cir. 1995) (Wald, J.,

dissenting) (emphasis omitted), aff'd, 518 U.S. 231 (1996). The two district

court cases cited by Southwestern Bell – both of which contain language

suggesting that harm to end-users is at least a relevant consideration in

determining whether a monopsony is actionable under antitrust law, see

Kamine/Besicorp Allegany L.P., 908 F. Supp. at 1203 (stating that, where there is little risk that monopsony "can injure consumers by forcing up the price of the end product . . . monopsony power per se does not create an antitrust concern"); Addamax Corp. v. Open Software Found., Inc., 888 F. Supp. 274, 280 (D. Mass. 1995) (noting that "[o]nly with control of a downstream market can the monopsonist decrease output and raise prices") – are inadequate to overcome the unmistakable import of the case law cited above.

Accordingly, we affirm the district court's summary judgment ruling excluding cellular phones from the relevant market definition.  Location owners are the relevant customers for purposes of locating Southwestern Bell's pay phone facilities, and from the location owners' perspective, cellular phone services and pay phone services are not interchangeable.

**B.** **Noerr-Pennington Doctrine**

The district court allowed the Plaintiffs to introduce evidence regarding allegedly misleading statements that Southwestern Bell made to the OCC. Southwestern Bell argues that admission of such evidence violated its First Amendment right to petition the government, as embodied in the Noerr-Pennington doctrine.  See United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365

U.S. 127 (1961). The district court held, and the Plaintiffs argue on appeal, that the evidence was admissible because it was offered, not for the improper purpose of showing that Southwestern Bell violated antitrust laws by misleading the OCC, but rather for the proper purpose of supporting the claim that Southwestern Bell acted for an improper monopolistic purpose (namely, showing that the pre-competition campaign to lock up the market in long-term contracts was done for monopolistic purposes). We conclude that the district court's admission of the evidence was not an abuse of discretion. See U.S. Football League v. Nat'l Football League, 842 F.2d 1335, 1374 (2d Cir. 1988) (reviewing admissibility of evidence under Noerr-Pennington doctrine for abuse of discretion).

The Plaintiffs argued to the jury at trial that Southwestern Bell, upon realizing that competition was coming soon, engaged in an all-out effort (referred to as the "Blitz") to lock as many location owners as possible into multi-year, automatically renewing contracts with unreasonable termination fees. Southwestern Bell argued that the Blitz was unrelated to the coming of competition, and was instead merely an effort to take advantage of new federal regulations allowing pay phone service providers to choose the long distance provider for the pay phone ("PIC rights"). The OCC, the state agency responsible for pay phone operations, considered ordering a "fresh look" rule that would have given location owners a window of time in which to void their existing contracts

with Southwestern Bell in order to enter into a contract with another pay phone service provider. The state attorney general supported the fresh start, viewing it as an efficient alternative to fact-finding to determine whether Southwestern Bell was moving to lock up location owners in long term contracts.

Ultimately, the OCC decided against the fresh look, but during the course of its deliberations it submitted the following interrogatory to Southwestern Bell: "Please state whether Southwestern Bell Telephone is attempting to get all current pay-phone customers to sign a new contract. If so please state the reason." Southwestern Bell replied "No. . . . Southwestern Bell is not attempting to obtain new contracts from all site owners that are currently under contract, nor is Southwestern Bell attempting to obtain contracts from all site owners with whom Southwestern Bell does not have a current contract." In a draft answer to this question not submitted to the OCC, Southwestern Bell had drafted "Southwestern Bell Telephone has strived to secure a contract on all pay phones since 1988." The draft answer went on to say that Southwestern Bell's motivation to obtain long-term contracts was to enable it "to secure the placement long enough to protect the large investment." Southwestern Bell's cross-examination of the witness through whom this evidence was presented (Rick Chamberlain, formerly of the Oklahoma Attorney General's office) suggests that its position was that it was not then "attempting" to get "all" customers to sign a new contract, as some

of its existing customers already under contract were not contacted during the "Blitz." In addition to objecting to the admission of the interrogatory response, Southwestern Bell argues generally that Chamberlain's testimony improperly allowed the jury to consider the fact that Southwestern Bell opposed the fresh look proposal.

The Noerr-Pennington doctrine is rooted in the First Amendment. As we have explained previously, "the Noerr-Pennington doctrine provides general immunity from antitrust liability under the Sherman Act to private parties who petition the government for redress of grievances, notwithstanding the anti-competitive purpose or consequences of their petitions." Cardtoons, L.C. v. Major League Baseball Players Assoc., 208 F.3d 885, 894 (10th Cir. 2000) (en banc). However, Noerr-Pennington does not bar the introduction of all evidence within its scope, as the Supreme Court recognized in footnote three of its Pennington decision: "It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial . . . if it tends reasonably to show the purpose and character of the particular transactions under scrutiny." 381 U.S. at 670 n.3.

Southwestern Bell argued to the trial court prior to introduction of this evidence that, under the Noerr-Pennington doctrine, "what we told the Corporation Commission can't support any inference in the case and ought not

come in at all." The district court rejected this argument, expressly relying on

Pennington footnote three. After cross-examining Chamberlain, Southwestern

Bell requested, and the court immediately issued over the Plaintiffs' objection, the

following cautionary instruction to the jury:

> Every citizen, including the plaintiffs and Southwestern Bell, has a right under the Constitution to petition the government and be heard on issues pertaining to rule-making proceedings like that at the Corporation Commission. The exercise of that right is immune from scrutiny under the antitrust laws. Therefore, I instruct you that Southwestern Bell Telephone Company's exercise of it[s] right to petition by participating in rule-making proceedings and advocating any position it chose at the Oklahoma Corporation Commission did not violate the antitrust laws.

Later, the jury was instructed without objection that it may consider the purpose

or intent of the anti-competitive act (i.e., the lock up efforts), and its pretextual

nature, in assessing its legality. Further, the jury was specifically reminded per

jury instruction that Southwestern Bell's communications with the OCC "did not

violate the antitrust laws," but that "you may consider this evidence if you find it

tends to show the purpose and character of the transactions under scrutiny."

Southwestern Bell argues that introduction of the evidence from the OCC

proceedings violated the Noerr-Pennington doctrine because it was offered for the

sole purpose of convincing the jury to find an antitrust violation based on

Southwestern Bell's interactions with the OCC. The Plaintiffs counter that the

evidence was not offered to establish monopolistic liability based upon

- 24 -

Southwestern Bell's interactions with the OCC, but rather to show that the "purpose" of the Blitz was to stifle competition, and that the explanation Southwestern Bell offered at trial (that the "Blitz" was to secure PIC rights) was pretextual. The Plaintiffs argue:

> In its opening statement and throughout trial, SWBT attempted to convince the jury that the Blitz was intended to secure 'PIC' long distance rights, not to preempt competition as Plaintiffs alleged. But SWBT's response to the OCC's factual inquiry does not contain any 'PIC' rights explanation for the Blitz. It also contradicted a 'draft' response in which SWBT admitted it had been attempting to get all its customers under contract for years. Finally, it contradicted testimony from SWBT management that, on the eve of competition, SWBT sent contract solicitation letters to all of its Oklahoma customers not already under contract. SWBT's response (and other evidence) proved SWBT's 'PIC' rights justification was pretextual, and the true purpose of the Blitz was predatory.

Restated, the Plaintiffs' "purpose" rationale for the use of this evidence is that, if the true impetus for the Blitz had been to secure PIC rights, Southwestern Bell would not have submitted a misleading response to the OCC interrogatory. Because the draft response suggests that Southwestern Bell was willing to disclose one innocent explanation for its contracting, the argument goes, it follows that Southwestern Bell also would have relied on the innocent PIC explanation if that had been a motivating factor, and the fact that it did not do so tends to prove that the PIC theory was a post-hoc pretext. This rationale for the evidence's admission falls within the scope of Pennington's footnote three. Whether or not the jury would have found the evidence persuasive on this point,

- 25 -

such an inference certainly would have been permissible.

Assuming that there is some proper purpose for admitting Southwestern Bell's interrogatory response and draft response (along with testimony regarding the context of that exchange), Southwestern Bell argues that the evidence still was inadmissible under Pennington footnote three because the probative value did not outweigh the prejudice. We disagree. In light of the legitimate purpose underlying the evidence's admission and the cautionary jury instruction given by the district court, admission of the evidence was not an abuse of discretion.[6]

## C.      State Action Doctrine

Southwestern Bell argues that "the state action doctrine (or analogous principles of state law) bars any use of SWBT's pre-November 1996 contracts to prove antitrust violations." The district court rejected Southwestern Bell's state action arguments on the ground that the doctrine applies only to federal antitrust claims, not state antitrust claims for which Southwestern Bell was found liable here. State action immunity is a question of law, which we review de novo. See Trigen-Okla. City Energy Corp. v. Okla. Gas & Elec. Co., 244 F.3d 1220, 1225

---

[6] Southwestern Bell's challenges to the other aspects of Chamberlain's testimony fall flat, as the only testimony potentially problematic under Noerr-Pennington – the fact that Southwestern Bell opposed the fresh look proposal – was elicited by Southwestern Bell during cross-examination. See Whiteley v. OKC Corp., 719 F.2d 1051, 1055 (10th Cir. 1983).

(10th Cir.), cert. denied, 122 S. Ct. 459 (2001). The Supreme Court has stated in the antitrust context that "state-action immunity is disfavored, much as are repeals by implication." FTC v. Ticor Title Ins. Co., 504 U.S. 621, 623 (1992).

We decline to address whether the state action doctrine applies to state antitrust claims. Even assuming that it does, the doctrine's requirements are not met under the circumstances of this case. Private parties regulated by the state must show two elements in order to demonstrate that they are entitled to state action immunity. "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy, and second, the policy must be actively supervised by the State." Trigen, 244 F.3d at 1226 (internal quotation marks omitted). To meet the first prong, "the state policy does not have to compel the private party to engage in anticompetitive conduct. If the state policy expressly permits, but does not compel, anticompetitive conduct, the private party may still qualify for state action immunity." Id. (emphasis added). Here, it is clear that no state policy expressly permitted Southwestern Bell to attempt to lock up customers contractually long beyond the November 1996 introduction of competition in an effort to stymie that competition. As the Plaintiffs note, the Oklahoma legislature's 1990 decision to bring competition to the pay phone market (a decision not implemented until 1996) suggests an opposite state policy. The second prong "mandates that the State exercise ultimate control over the

- 27 -

challenged anticompetitive conduct." Id. (internal quotation marks omitted). Here, the state likely was not even aware of the full extent of Southwestern Bell's lock up conduct, let alone exercising ultimate control over it. The state action immunity doctrine does not apply to this case.[7]

Southwestern Bell offers a cursory alternative argument that the Plaintiffs' claims are barred by the exclusivity of the OCC's jurisdiction. The only authority cited in support of this argument is Trigen. However, Trigen is obviously distinguishable. All of the state antitrust claims in Trigen involved a challenge to rates charged by a regulated utility with a continuing legal monopoly. 244 F.3d at 1228 (stating that "we construe all of Trigen's state law claims as collateral attacks on [Oklahoma Gas & Electric] filed rates"). The rates charged by the utility were determined by the OCC, not by the utility. Id. Trigen's conclusion that a challenge to the state-mandated rates charged by the utility amounted to an unlawful collateral attack was derived from the Oklahoma Constitution's

---

[7] Cf. Central Telecomm., Inc. v. TCI Cablevision, Inc., 800 F.2d 711 (8th Cir. 1986), where the Eighth Circuit rejected a cable provider's argument that "as a matter of law, it could not have possessed monopoly power because [the municipality] regulated price and entry in the cable television business." Id. at 726. The court recognized that TCI had the power to raise the price of premium channels without the approval of the municipality and that it "used its entrenched position and . . . various unethical or illegal practices . . . to exclude competition." Id. Of course, in the case before us, Southwestern Bell cannot even claim that its long-term contracts with coercive terms and its anti-competitive "Blitz" were regulated, or even known, by the OCC.

requirement that an "appeal from <u>an order</u> of the OCC 'affecting the rates, charges, services, practices, rules or regulations of public utilities . . . shall be to the Supreme Court [of Oklahoma] only . . . .' Okla. Const. art IX, § 20." <u>Id.</u> at 1228 (emphasis added, ellipses in original).

The exclusive jurisdiction of the OCC is not implicated here because, unlike the plaintiff in <u>Trigen</u>, the Plaintiffs are not challenging any order of the OCC, or any action by Southwestern Bell mandated by an order of the OCC. The OCC's refusal to impose the fresh look does not imply that it was endorsing Southwestern Bell's lock up campaign. To the contrary, the record suggests that the OCC's ignorance of the lock up campaign's scope may have contributed to its decision not to impose the fresh look. Although Southwestern Bell asserts that "plaintiffs chose not to appeal to the Oklahoma Supreme Court" the OCC's decision not to adopt the fresh look, Southwestern Bell fails to offer any basis for concluding that such an appeal from agency <u>inaction</u> was available. <u>See</u> Okla. Const. art. 9, § 20. In any event, the Plaintiffs are not complaining about anything the OCC did or did not do. They are complaining about anti-competitive unilateral activity by Southwestern Bell that was neither mandated, nor authorized, nor reviewed, nor even known about by the OCC. Accordingly, we conclude that Southwestern Bell's exclusive jurisdiction argument fails.

**D.      Market Power through Contracts**

Southwestern Bell argues that the trial court improperly allowed the jury to consider the multi-year, automatically renewing contracts between Southwestern Bell and the location owners as evidence of market power.  It argues that its contract power was limited because the duration of the contracts from which that power derived was limited; such necessarily temporary control of a market cannot constitute monopoly, it argues.  The district court rejected this argument:

> Defendant bases its argument . . . on assumptions rejected by the jury.  First, Defendant argues that entry into the pay phone market is easy.  As noted by Plaintiffs, such an argument flies in the face of the testimony of numerous witnesses that Defendant's contract activities had imposed substantial barriers to making a profitable entry into the market. Plaintiffs' argument was bolstered by Defendant's own internal memos reflecting an intent to make it hard for competitors to take customers away from Defendant.  Further, the very language of Defendant's contracts evidences a persistent control over the market. Weighing the evidence in favor of Plaintiffs as the Court must, there is clear support that Defendant's intent and the actual effect of the contracts was that they can last forever. Not only did Defendant impose significant restrictions on how the contract could be terminated, it also severely restricted who could terminate a contract.  Moreover, Defendant's own internal memos reflect its intent that the contracts never terminated but had anniversary dates.  This evidence was sufficient for the jury to find Defendant's contracts were more than temporary or transitory.  Finally, the jury was presented evidence that even when Plaintiffs secured a location in which to place a pay phone, Defendant's actions of quoting high termination fees, removing equipment early, or failing to remove equipment, were directed at preventing the switch.  Considering this evidence in the light most favorable to Plaintiffs, it is clear the jury acted reasonably in finding Defendant held a monopoly.

On appeal, Southwestern Bell merely reasserts that temporary contract

power cannot constitute monopoly power, making no effort to challenge the district court's conclusion that the jury properly could have concluded that the contracts were meant to, and did, have a non-temporary (indeed nearly permanent) effect. That Southwestern Bell presented evidence from which the jury could have reached the contrary conclusion does not warrant reversal.

Southwestern Bell also argues that the district court erred in refusing to issue the following jury instruction:

> If the evidence demonstrates that the defendant's alleged restrictive, exclusionary or predatory conduct will necessarily be temporary, the defendant will not possess the degree of market power required for the monopolization or attempt to monopolize claim. An example of temporary conduct is conduct that is limited by the duration of a contract.

As given, Southwestern Bell argues, the instructions erroneously permitted the jury to premise monopoly liability on contract power, even if the jury did not accept the Plaintiffs' arguments about the non-temporary nature of the contracts.

We review the court's refusal to give a particular instruction for abuse of discretion. Coletti v. Cudd Pressure Control, 165 F.3d 767, 771 (10th Cir. 1999). "We do not decide whether the instructions are flawless, but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to decide those issues. So long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction is not grounds for reversal." Id. (internal quotation marks, citations, and alteration omitted).

- 31 -

Although Southwestern Bell offered its alternative instruction, there is no indication that it objected to the instructions the court did offer. As such, we review the court's instructions for plain error. United States v. Voss, 82 F.3d 1521, 1530 (10th Cir. 1996) (applying plain error review where "defendants cite their own proffered instructions, [but] have not indicated a place in the record in which they objected to the court's instruction"); Fed. R. Civ. P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.").

We reject Southwestern Bell's challenge to the instructions, finding that the instructions as a whole were adequate to alert the jury to consider the duration of the effects of any anti-competitive contracts. The jury was told that, in determining "whether any of defendant's practices were predatory or exclusionary," it should consider various factors, including "the duration of any foreclosure of competition caused by [Southwestern Bell's] conduct."

Further, the district court properly rejected Southwestern Bell's proffered instruction, which by listing "conduct that is limited to the duration of the contract" as an example of "temporary conduct," would have misled the jury into believing that any anti-competitive conduct authorized by contract immunizes that conduct from state antitrust scrutiny. That tendered instruction further incorrectly

assumed that contracts of any duration, even those contracts here that could be

found to be essentially perpetual, should be considered "temporary" and thereby

immune from the antitrust law.  Thus, the tendered instruction was misleading and

incorrect (as well as unnecessary in light of the correct instructions that were

given).  Thus, refusing to give that instruction was not error.[8]


## E.    Damages Based on Future Misconduct

Southwestern Bell argues that the damages awarded below necessarily and

impermissibly reflect an award of future damages flowing from future

misconduct.  The district court rejected this argument:

> [E]ven if Defendant immediately ceased all anti-competitive practices
> following the verdict, the effects of its prior bad acts would continue.
> Defendant still holds numerous long-term contracts which affect future
> competition.  There was no suggestion or evidence at trial that those
> contracts would cease to exist or be terminated by defendant.

---

[8] Southwestern Bell cites Colorado Interstate Gas Co. v. Natural Gas Pipeline Co., 885 F.2d 683 (10th Cir. 1989), as support, but that case by no means forecloses the consideration of contractual activity in determining monopoly liability.  In Colorado Interstate Gas, the potential monopolist's market power derived solely from a contract with a fixed expiration date, and the court found this to be an insufficient basis for monopoly liability under the circumstances in light of "the certainty that the market will return to the status quo at a predetermined date and the fact that [the alleged monopolist] has no power to prevent the erosion of its market share."  Id. at 697 n.24.  By contrast, Southwestern Bell's liability was based on a whole system of contracts with exclusionary terms (including provisions that the district court found could cause many of them, in fact, to last forever), as well as an abundance of other anti-competitive conduct.

Additionally, there was evidence of the business growth Plaintiffs would have experienced if allowed to enter a healthy market when it was newly opened if not for Defendant's conduct.

We agree that the jury's damages award is proper.

At trial, the Plaintiffs' damages model totaled over $27 million, while Southwestern Bell's damages model was under $1 million. The district court instructed the jury that it "may consider evidence relating to the profits each plaintiff has not received in the past, and will not receive in the future, because of defendant's <u>past unlawful conduct</u>" (emphasis added), and forbade the jury to award purely speculative damages. The jury, per general verdict form not objected to by either party, awarded damages of $7,465,450.

Southwestern Bell faces a steep uphill climb in attempting to overturn the jury's damages award. In addressing a challenge to a jury's damages award in an antitrust case, the Supreme Court held that the award "must be allowed to stand, unless all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts." <u>Story Parchment Co. v. Paterson Parchment Paper Co.</u>, 282 U.S. 555, 566 (1931). This court has explained further that:

> We review a district court's disposition of a motion for remittitur or new trial on damages for a manifest abuse of discretion. . . .
>
>> In order to establish an abuse of discretion, the party that moved unsuccessfully for a new trial on the basis of an excessive verdict carries the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence. In

> applying the abuse of discretion standard, we are also
> mindful that absent an award so excessive or inadequate as
> to shock the judicial conscience and to raise an irresistible
> inference that passion, prejudice, corruption or other
> improper cause invaded the trial, the jury's determination
> of the fact is considered inviolate.

Hynes v. Energy West, Inc., 211 F.3d 1193, 1206 (10th Cir. 2000) (quoting

Campbell v. Bartlett, 975 F.2d 1569, 1577 (10th Cir. 1992)). We have said that,

even where a "persuasive" explanation of the jury's damages award indicates an

award contrary to law, the possibility of a proper explanation, "[h]owever slight

the chance," will suffice to sustain the damages award. United Phosphorus, Ltd.

v. Midland Fumigant, Inc., 205 F.3d 1219, 1228 (10th Cir. 2000) (rejecting

defendant's double recovery claim, even though the damages were precisely the

sum of the two amounts that could not be aggregated, because "the jury's award

was well within the range of proof"). Against this background, Southwestern

Bell's damages arguments fall short.

Both parties agree that, in an antitrust case, future damages may be

recovered for past misconduct but not for future misconduct. The Plaintiffs focus

their defense of the judgment on the proposition that the jury could have awarded

the damages it did solely by reference to past misconduct. Looking only to the

pay phone locations that they allegedly had already lost at the time of trial as a

result of Southwestern Bell's monopolistic behavior (1,863 pay phones), the

Plaintiffs calculate that the total damages flowing from the deprivation of these

1,863 phones was $7,490,187 (roughly $35,000 greater than the jury awarded).

Of this number, roughly $2.74 million is profits lost prior to trial, and the

remainder is profits lost after trial as a result of Southwestern Bell's continuing

enforcement of its contracts with respect to these 1,863 phones.

Southwestern Bell does not challenge the Plaintiffs' arithmetic, but does

contest the logical underpinnings of their argument. It contends that the future

enforcement of past contracts is future misconduct, not past misconduct. The

essence of Southwestern Bell's position is this: "Any damages from existing

contracts are avoidable, either by SWBT ceasing to enforce unlawful contracts, or

by an injunction barring their enforcement." We do not believe that either ground

justifies overturning the damages award.

First, Southwestern Bell contends that damages arising from the future

enforcement of the contracts are avoidable because SWBT would stop enforcing

"unlawful contracts." Southwestern Bell acknowledges that, as the district court

noted, it presented no evidence at trial that it would "ceas[e] to enforce" the

contracts, but contends on appeal that "it is absurd to require a defendant, arguing

that contracts are legal, to tender witnesses to promise that it would not enforce

lawful agreements in the future." However, Southwestern Bell never offered in

the record any assurance that it would cease to enforce its contracts with location

owners. Southwestern Bell suggests that such evidence is unnecessary because

the law presumes that the antitrust defendant will obey the law, which compels the conclusion that Southwestern Bell would not enforce unlawful contracts. Southwestern Bell offers no authority, binding or otherwise, suggesting that the presumption of lawful behavior extends to the forfeiture of existing contract rights. Indeed, as the Plaintiffs note, they never sought a ruling on the enforceability of individual contracts, nor would such a ruling be proper in the absence of the thousands of contracting third-party location owners in this litigation. Presumably not all of the location owners would want to terminate their contracts with Southwestern Bell. If Southwestern Bell were to decide unilaterally that it would treat the contracts as null and void, it may expose itself to breach of contract claims by the location owners. This suit was about holding Southwestern Bell accountable to the Plaintiffs for its past monopolistic behavior, and the future enforceability of its contracts vis-a-vis all the location owners was simply not before the court. Under such circumstances, the district court was not obligated to assume that Southwestern Bell would voluntarily terminate its contracts with location owners.

Second, Southwestern Bell argues that the district court erred by upholding damages based upon future enforcement of past contracts rather than entering an injunction forbidding Southwestern Bell to enforce its contracts. As an initial matter, Southwestern Bell does not indicate that it requested or consented to such

- 37 -

an injunction either before or after the jury decided the damages issue. Even assuming that the possibility of injunctive relief was raised before the district court, Southwestern Bell offers no support for its position that the possibility of issuing a contract-voiding injunction renders damages based upon continuing enforcement of the contracts improper as a matter of law. Neither of the cases cited by Southwestern Bell supports such a proposition. National Society of Professional Engineers v. United States, 435 U.S. 679, 697-98 (1978), addressed the quite different question of whether a court could injunctively limit an antitrust defendant's free speech rights. The interplay between the money damages for future action and the availability of injunctive relief was not even remotely implicated. The same may be said of the district court case cited by Southwestern Bell, Board of Regents v. NCAA, 601 F. Supp. 307 (W.D. Okla. 1984). The case is relevant only in that it provides an example of a decision to enjoin the enforcement of contracts found to violate the antitrust laws. See id. at 308. Southwestern Bell offers no relevant authority in support of its argument that the possibility of a contract-avoiding injunction forecloses the availability of damages based on future enforcement of continuing contracts. We perceive no justification for creating such a rule, and therefore reject Southwestern Bell's argument. As the Supreme Court recognized in National Society of Professional Engineers, "[t]he standard against which the [district court's] order must be judged is

whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." 435 U.S. at 698. There is no reason to doubt that the jury's damages award did just that.

## CONCLUSION

The judgment below is **AFFIRMED**.[9]

---

[9] All outstanding motions are denied.

Nos. 01-6067, 01-6138, Telecor Communications, Inc. et al. v. Southwestern Bell Telephone Co.

**KELLY**, Circuit Judge, dissenting.

I would reverse on three grounds and respectfully dissent. In my view, the district court erred (1) by defining the relevant market on summary judgment, (2) in allowing the jury to base antitrust liability on contracts that were subject to OCC regulation and thereby immune from collateral attack under the state action and exclusive jurisdiction doctrines, and (3) in allowing damages for future enforcement of contracts that are necessarily void as against public policy under the jury's interpretation of the evidence.

1. Defining the Product Market on Summary Judgment.

Plaintiffs prevailed upon their state-law monopolization and restraint of trade claims,[1] which require proof of a relevant market. "A relevant market is

_____

[1] Okla. Stat. Ann. tit. 79, § 203 provides in pertinent part:

A. Every act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal.
B. It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state.
. . . .
 D. As used in this section:
1. "Monopolize" means:
a. the possession of monopoly power in the relevant market, and

(continued...)

determined by consideration of two elements: (1) A relevant *geographic* market; that is, the geographical territorial area involved; and (2) a relevant *product* market–the type or area of goods or services in which the product which is subject to the restraint effectively competes." Teleco, Inc. v. Ford Indus., Inc., 587 P.2d 1360, 1364 (Okla. 1978) (italics in original). Despite genuine issues of material fact, the district court granted the Plaintiffs' motion for summary judgment on relevant product market. The court defined the relevant market "as the provision of public pay phones and related pay phone services for the territory in Oklahoma in which SWBT operates as a Local Exchange Carrier." Aplt. App. 2149. It did so on the strength of its holding that SWBT's expert's conclusion concerning the interchangeability of pay phones and cell phones was "simply unreasonable given the facts in the record." Id.

The district court incorporated its summary judgment ruling in its jury instructions defining the relevant market for the restraint of trade and monopoly

---

[1](...continued)
b. the willful acquisition or maintenance of that power by exclusionary conduct as distinguished from growth or development as a consequence of a superior product and/or service, business acumen, or historic accident;
2. "Monopoly power" means the power to control market prices or exclude competition;
. . . .

See also Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1543-44 (10th Cir. 1996) (discussing elements of restraint of trade in Oklahoma).

-2-

claims. Aplt. App. 3470, 3483, 3500. According to this court, "the parties allowed the jury to determine which set of customers should be used in evaluating monopoly power," the pay-phone location owners or the end-users (consumers) of pay-phone services.[2] Ct. Op. at 6.

We readily recognize that the district court could not have properly granted summary judgment on whether the relevant market includes cell phones as well as pay phones. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 468-69 (1992) (non-movant in antitrust case need only prove its inferences are reasonable, as opposed to "economically senseless"). Equally problematic is the district court's exclusion of SWBT's expert testimony on the product market issue without benefit of a Daubert analysis. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); see also United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000) ([T]he [district] court must, on the record, make some kind of reliability determination.") (emphasis in original). Yet this court concludes that "regardless of the interchangeability of pay phones and cell phones at the end-user level, there is no doubt that pay phones and cell phones are not interchangeable at the location-owner level, and that is the level where the

---

[2] In defining the relevant product market as a matter of law, the district court effectively rejected SWBT's contention that it should be evaluated at the level of the end users. This legal ruling is before us. See Ruyle v. Continental Oil Co., 44 F.3d 837, 841 (10th Cir. 1994).

Plaintiffs argued that Southwestern Bell has monopolized competition." Ct. Op. at 12; see also id. at 20. Without question, the various "levels" of distribution for pay-phone services are implicated.

There is no dispute that defining the relevant market is a factual matter normally entrusted to the trier of fact, here the jury. See Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 975 (10th Cir. 1990); Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1220 (10th Cir. 1986); Telex Corp. v. Int'l Bus. Machs. Corp., 510 F.2d 894, 915 (10th Cir. 1975) (per curiam). The jury should have been allowed to determine the relevant market because there was a factual dispute on summary judgment as to whether Plaintiff's theory was correct. See III Aplt. 743-48; V Aplt. App. 1281-83. This court's holding that end-users of phone services do not matter is in considerable tension with the Supreme Court's holdings that the relevant product market is made up of "commodities reasonably interchangeable by consumers for the same purposes," meaning that the cross-elasticity of demand between products must be similar but need not be identical. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956); see also United States v. Continental Can Co., 378 U.S. 441, 443 (1964); Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). While it is true that du Pont involved a consumer market for cellophane and flexible packaging and that Plaintiffs here allege that the market involves competing for

-4-

pay phone locations of location owners, neither reason compels the Plaintiffs'

definition of the relevant product market.

In du Pont, the government accused du Pont of monopolizing the market for

cellophane, and the issue before the Court was whether the relevant product

market consisted of cellophane alone or all flexible wrappings. Id. at 380-81.

Notwithstanding the government's attempt to define the relevant market narrowly,

the Court held "that cellophane's interchangeability with the other materials

mentioned suffices to make it part of this flexible packaging market." Id. at 400.

In this case, the Plaintiffs argue for a narrower market, one lacking any

interchangeable commodities. See Eastman Kodak, 504 U.S. at 481 (holding that

a relevant market may consist of a single product or service and must be

evaluated from the perspective of the choices available to Kodak equipment

owners). It is undisputed that no public cellphones are available to location

owners. The contractual support for Plaintiffs' theory–that the SWBT standard

contract identifies the location owner as a "customer"–is illusory at best. See

Aplt. App. 1115-16 (contract); see also Twin City Sportservice, Inc. v. Charles O.

Finley & Co., 512 F.2d 1264, 1272 (9th Cir. 1975) (relevant products were

franchises available to concessionaire, not concession products marketed to

consumers or concession services to major league baseball teams). The contracts

actually provide that location owners are paid a commission by SWBT for "the

right to install and maintain SWBT public pay telephone(s) and associated equipment (payphone equipment)" on their property. Aplt. App. 1115-16 (contract). This suggests that payphone service providers do not sell payphones or payphone services to location owners, but rather sell payphone services to traditional consumers (end users) and use the location owners as a method of distribution. In any event, as the district court acknowledged and the record confirms, the factual issues surrounding the relevant product market and the perspective from which it should be evaluated were hotly contested on summary judgment. Aplt. App. 2142.

This circuit has cautioned about overly restrictive definitions of the relevant product market, notwithstanding that a potential distributor alleged antitrust injury from a manufacturer's refusal to deal. In Westman, a distributor of kitchen equipment alleged that Hobart, a kitchen equipment manufacturer, refused to grant a distributorship in violation of § 1 of the Sherman Act. The district court viewed one type of distribution method ("one stop shopping") as comprising the relevant product market. This court reversed, holding that the relevant product market must be defined by interchangeability of products from the perspective of consumers, not distributors. After noting that "the purpose of the antitrust laws is the promotion of consumer welfare," Westman, 796 F.2d at 1220, the court stated:

> In defining the relevant market as "one-stop shopping," the trial court apparently focused on the system of product distribution rather than the market facing the consumer of restaurant equipment. The trial court's focus justified the conclusion that "one-stop distribution" is an effective way to compete in the market. But the fact that "one-stop distribution" is an effective or even superior way to compete does not mean that the relevant market is limited to those who use that method of competition. "Any definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful."

Id. at 1220-21 (citation omitted). Finding that other restaurant equipment was reasonably interchangeable, the court held "that the relevant product market at a minimum consisted of the products generally sold by restaurant equipment dealers, whether or not those dealers carried a wide enough range of products and brands to be classed as 'one stop shopping' distributors." Id. at 1221 (emphasis added). Although Westman involved a § 1 claim, its holding concerning the relevant market is also fully applicable to a § 2 monopolization claim. See Thurman Indus. Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1373, 1378 (9th Cir. 1989) (market definition required for § 1 and § 2 claim). The district court's grant of summary judgment in this case foreclosed jury consideration of evidence that showed that cellphones competed for consumers' business, took customers from payphone providers and constrained pricing, all of which could have enabled the jury to conclude cellphones were in the relevant market. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224-25 (1993) (antitrust laws protect against injury to competition, not competitors); Beville v.

-7-

Curry, 39 P.3d 754, 759-60, 764 (Okla. 2001) ("The *sine qua non* of an antitrust claim is injury to competition.") (emphasis in original), reh'g granted, (Oct. 9, 2001). In other words, SWBT was entitled to be heard by a jury on the allegation that it lacked the power to control market prices <u>or</u> exclude competition vis-a-vis the relevant market it contended for. See Aplees. Sur-Reply Br. at 6 (arguing that monopoly claim verdict could be affirmed on either theory); see also Beville, 39 P.3d at 760 ("Market power is the preliminary threshold inquiry and is often dispositive of antitrust cases."). One need not accept SWBT's monopsony argument to conclude that the relevant market should have been decided by the jury, not the district court. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993) (holding that proof of relevant market is essential under § 2). The evidence plainly "present[ed] a sufficient disagreement to require submission to a jury . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986).

2. Rejecting the State-Action and Exclusive Jurisdiction Doctrines.

Although this court declines to decide whether the state-action doctrine applies to state antitrust claims, it seems clear that it does apply, contrary to the district court's holding. Aplt. App. 3942-43. Oklahoma's antitrust law is to "be interpreted in a manner consistent with federal antitrust law . . . and the case law applicable thereto." Okla. Stat. Ann. tit. 79, § 212; see also Teleco, Inc. 587 P.2d at 1362; Oakridge Investments, Inc. v. S. Energy Homes, Inc., 719 P.2d 848, 850

(Okla. Ct. App. 1986).  Nothing suggests that Oklahoma would reject the state-action doctrine which we have applied to federal antitrust claims in similar circumstances.  See Trigen-Oklahoma City Energy Corp. v. Oklahoma Gas & Elec. Co., 244 F.3d 1220, 1225-1226 (10th Cir. 2001) (recognizing Oklahoma's policy of allowing regulation instead of competition in electricity sales); S. Disposal, Inc. v. Tex. Waste Mgmt., 161 F.3d 1259, 1263 (10th Cir. 1998) (recognizing Oklahoma's policy of allowing regulation instead of competition in waste disposal services).

This court decides that the state action does not apply to the circumstances of this case because (1) "it is clear that no state policy expressly permitted Southwestern Bell to attempt to lock up customers contractually long beyond the November 1996 introduction of competition in an effort to stymie the competition," and (2) "the state likely was not even aware of the full extent of Southwestern Bell's lock up conduct, let alone exercising ultimate control over it."  Ct. Op. at 27-28.

Here, the state plainly made clear its intent to regulate telephone services, including payphone services, until the OCC permitted competition.  See Okla. Const. art. IX, §§ 18, 34;[3] Okla. Stat. Ann. tit. 17, § 131 (OCC issues certificate

---

[3]  Okla. Const. art. 9, § 18 provides in part:

(continued...)

of convenience and necessity); Okla. Stat. Ann. tit. 17, § 139.1 (directing the OCC to "promulgate and enforce operating requirements for coin-activated telephones and credit card-activated telephones available for public use owned or operated by corporation or persons other than telephone corporations authorized by the Commission to operate within service areas."); Southwestern Bell Tel. Co. v. Oklahoma, 825 P.2d 262, 265 (recognizing that local exchange companies are a state-created exception to prohibition on monopolies); Aplt. App. 3711-3724 (1985) (OCC 1985 Tariff Order rejecting competitive payphones, and ordering that SWBT "be and hereby is the only authorized provider of coin phone service within its territory."). Rather than concentrating on the particular field of regulation, this court focuses upon the effects of alleged anti-competitive conduct beyond November 1996. But the proper inquiry is whether Oklahoma intended to

[3](...continued)
The Commission shall have the power and authority and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and to that end the Commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just, which said rates, charges, classifications, rules, regulations, and requirements, the Commission may, from time to time, alter or amend.

displace competition in the payphone market with a regulatory program until November 1996. See S. Motor Carriers Rate Conference v. United States, 471 U.S. 48, 64-65 (1985). The answer is clear–not until the OCC determined how and when competition could begin did Oklahoma change its policy.

The OCC had ultimate control over SWBT's alleged anti-competitive conduct, which goes to satisfy the two-part Midcal test for state action immunity. See Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) ("First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself.") (citation omitted). Concerning the first part, the state need only permit the conduct to occur–approval is unnecessary. Trigen, 244 F.3d at 1226. As discussed above, Oklahoma plainly regulated the field. Concerning the second part, state officials must have and exercise power to review alleged anti-competitive acts. Patrick v. Burget, 486 U.S. 94, 101 (1988).

We have twice concluded that Oklahoma's pervasive regulation of electric utilities satisfied the "active supervision" requirement. See id.; Lease Lights, Inc. v. Pub. Serv. Co. of Okla., 849 F.2d 1330, 1334 (10th Cir. 1988). In Trigen, we based satisfaction of the active supervision requirement on the OCC's regulatory authority. 244 F.3d at 1226. In Lease Lights, we looked not only at the OCC's grant of authority but also considered actual proceedings of the OCC. 849 F.2d at

1334.

In this case, not only OCC's regulatory authority, but also its actual proceedings and rulemaking, support the active supervision requirement. Specifically in 1996, the OCC was concerned with competition and addressed it in a formal rulemaking proceeding which resulted in administrative regulations. Aplt. App. 3725 (Notice of Rulemaking) (OCC proposed to establish rules including "what safeguards are necessary to protect the interest of competitive payphone service providers"); Aplt. Add. tab 8 (Okla. Admin. Code. tit, 165, ch. 58 (Facilitation and Provisioning of Payphone Service); id. at tab 12 (OCC's Agency Rule Report Establishing Pay Telephone Service Rules).

Tellingly, an assistant attorney general in arguing for the "fresh look" proposal before the OCC stated:

> And it's hard for me to imagine that anyone would seriously argue that existing payphone service contracts are not a significant barrier to new entrants. The incumbent LECs have had decades of monopoly status in order to identify the most lucrative sites within their service territories, and they have had months to gain a competitive advantage through going out and renegotiating those contracts. The payphone rules, we believe, should allow a renegotiation window.

Aplt. Add. tab 11 at 22 (Rick Chamberlain testimony before the OCC);[4] see also

---

[4] The Plaintiffs argue that this transcript should be stricken as it was not before the district court. See United States v. Kennedy, 225 F.3d 1187, 1190-91 (10th Cir. 2000). I would grant SWBT's motion to supplement the record pursuant to Fed. R. App. P. 10(e)(2)(C), because the substance of Mr.

(continued...)

Aplt. App. 3729-3741 (Oklahoma Attorney General's brief before OCC arguing that OCC had jurisdiction to consider payphone service and the location of payphones and existing LEC contracts were a barrier to competition). Various providers complained to the OCC about the renegotiation tactics of SWBT as hindering competition, even including SWBT's May 1, 1996 letter to location owners. Aplt. App. 3743-3748 (Textel Communications, Inc.'s); 3752-3765 (Cherokee Communications, Inc.). The record reveals that parties were divided over the fresh look proposal, whether the OCC had jurisdiction to entertain it, and whether it was constitutional. Ultimately, the OCC voted against adopting it, but indicated its willingness to reconsider the matter with discussion and investigation, at the invitation of the industry. Aplt. Add. tab 12 at 11. All of this suggests that the OCC could and did consider the alleged anti-competitive conduct of SWBC. The fact that the OCC might not have been aware of the full extent of SWBT's alleged anti-competitive conduct (which is pure speculation) or declined to intervene is of no moment–the heart of this case is SWBT's pre-competition contracts which the OCC reviewed and allowed to remain in effect.

_____

[4](...continued)
Chamberlain's comments is contained in his testimony before the district court, Aplt. App. 4622, and the payphone regulatory system in Oklahoma was always an issue in this case. Further, given that the district court held that the state-action doctrine did not apply, inclusion of this transcript in no way results in the appellate court deciding an issue with evidence that might have made a difference to the district court.

SWBT's alleged bad acts are insufficient to defeat state action immunity. See Trigen, 244 F.3d at 1227 (even if OG&E had committed certain improper acts in the regulated sale of electricity, state action immunity was proper).

The exclusivity of the OCC's jurisdiction over matters concerning payphones is apparent. No appeal was taken from the OCC's decision not to impose a fresh look. Although this court questions whether such an appeal could have been maintained, the constitutional provision allows an appeal "from any action" of the OCC "prescribing . . . practices, rules or regulations" and "by any party affected, or by any person deeming himself aggrieved by any such action . . . ." Okla. Const. art. 9, § 20. This is hardly a limited grant of standing. In the context of the fresh look proposal, the OCC was exercising its constitutional and statutory authority to promulgate the payphone rules and regulations. Aplt. Add. tab 12 at 3. The court's suggestion that an appeal could not have been taken from agency inaction ignores the forest for the trees. Moreover, the Oklahoma Supreme Court has passed on OCC inaction before. Turpen v. Okla. Corp. Comm'n, 769 P.2d 1309, 1325 (Okla. 1988) (OCC did not err in deciding to address imputed value issue later). Analogous to Trigen, the Plaintiffs' state antitrust claims based upon pre-November 1996 conduct are nothing more than a collateral attack on the OCC's right to supervise, regulate and control matters relating to the performance of transmission company public duties and of

-14-

correcting abuses. See Okla. Const. art. 9, § 18. A major part of Plaintiffs' case concerns SWBT's pre-competition contracts, which the OCC reviewed and allowed to remain in effect and which plainly come within the OCC's constitutional and statutory jurisdiction.

3. Allowing Damages for Future Enforcement of Contracts

The court is undoubtedly correct that antitrust damages are not subject to a rigorous standard of proof; estimates and reasonable inferences of damages are sufficient. See J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 567 (1981); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 (1969). At the same time, an antitrust plaintiff has the burden of proof and damages cannot be speculative. See Wells Real Estate, inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 816 (1st Cir. 1988). Future damages are permissible, but only to the extent that they are based upon past wrongdoing. Lawlor v. Loewe, 235 U.S. 522, 536 (1915).

In Oklahoma, a statutory antitrust action is in the nature of tort, and is not an action on contract. McDonald v. Amtel, Inc., 633 P.2d 743, 745 (Okla. 1981). Here, however, the contracts were integral to the proof of damages. Whether based upon SWBT continuing to enforce its contracts or on the rationale of free and open competition beginning in 1996, the damage award in this case presupposes that SWBT's anti-competitive acts will continue post-verdict and the

contracts will continue to be enforced.   This assumption is wrong as a matter of law.  It must be remembered that the Plaintiffs prevailed upon their state-law restraint of trade claim and that such acts, and contracts which are the product of such acts, are "against public policy and illegal."  Okla. Stat. Ann. tit. 79, § 203(A); First Nat'l Pictures v. Pappe, 39 P.2d 526, 530 (Okla. 1934) ("[I]f [a] contract was made in violation of the anti-trust laws, it was an illegal and unenforceable contract"); see also United States v. Addyston Pipe & Steel Co., 85 F. 271, 290 (6th Cir. 1898) (holding that contracts where the primary purpose is to restrain trade are void).  Plainly, the damage award based upon future damages is inappropriate and inconsistent with the objectives of antitrust law when an injunction against future anti-competitive conduct would solve the problem.  See United States v. Or. State Med. Soc., 343 U.S. 326, 333 (1952).

4.  Conclusion.

The district court erred in defining the relevant product market and not applying the state action or exclusive jurisdiction doctrines to bar the Plaintiffs' claims arising prior to payphone competition.  The damages award represents impermissible future damages based upon future anti-competitive conduct that would be unlawful.

Because a new trial would be required on remand, the district court again would have to consider the admissibility of SWBT's interrogatory answer and its

draft response under the <u>Noerr-Pennington</u> doctrine.  Given that the pre-November 1996 conduct is not actionable and that the district court found that the interrogatory was poorly worded and resulted in an accurate but incomplete response, this line of inquiry would carry an even stronger danger of unfair prejudice than before, even with a limiting instruction.  Though it may be admissible under footnote 3 of <u>Pennington</u>, such evidence still has to shed some light on "the purpose and character of the particular transactions under scrutiny," <u>United Mine Workers v. Pennington</u>, 381 U.S. 657, 670 n.3 (1965), which would include transactions subsequent to November 1996.  Plainly, the jury in this case was exposed to the theory that SWBT's advocacy before the OCC demonstrated its intent to monopolize.  Aplt. App. 4708;  Aplt. App. 8379-80 (closing argument).  Though the district court instructed the jury to disregard an answer espousing this theory, it points to the need for caution with this evidence.